[No. B146437. Second Dist., Div. Eight. May 24, 2002.]

MEGHANN GIARDINO, a Minor, etc., et al., Plaintiffs and Appellants, v. BART BROWN, Defendant and Respondent.

**COUNSEL**

Girardi and Keese, Thomas V. Girardi, James B. Kropff and Amanda L. McClintock for Plaintiffs and Appellants.

Pivo, Halbreich, Cahill & Yim, Thomas L. Wilson and Bill H. Kollias for Defendant and Respondent.

**OPINION**

**COOPER, P. J.**—Daryle Ann Giardino, mother and guardian ad litem of minor Meghann Giardino (interchangeably plaintiff), appeals following summary judgment for defendant Bart Brown doing business as Yosemite

Equestrian Services, Inc. (YES). Plaintiff was seriously injured while at Girl Scout camp and claims that YES was at least partially liable because it supplied to the camp a horse, Quarter, inappropriate for inexperienced riders like plaintiff.[1] Finding no bar by the doctrine of assumption of the risk and that a material issue of fact exists, we shall reverse the summary judgment.

## PROCEDURAL HISTORY

### *The complaint*

The gravamen of plaintiff's operative first amended complaint, relating to YES, was that defendants "negligently furnished to plaintiff a horse for instruction which was dangerous and not suited for Plaintiff's skill level. Defendants knew or should have known of such dangerous propensity and that the horse was unsuitable for Plaintiff, as an inexperienced equestrian,[2] and yet defendants negligently furnished such horse to plaintiff without warning Plaintiff of such propensity." She allegedly was an "inexperienced and unskilled rider, incapable of riding any horse other than a gentle and dependable horse" and suffered serious injury when she was negligently permitted to tie Quarter to the hitching post and the horse became "spooked" causing her fingers to be caught in the rope. Her injuries included the loss of a finger and later amputation of another finger.

### *Motion for summary judgment*

YES filed its motion for summary judgment (MSJ) as to both plaintiff and cross-complainant Girls Scouts. The basis of the MSJ was that YES "(1) had no contact with plaintiff, (2) made no representation to plaintiff, (3) did not undertake any duty to supervise plaintiff, (4) the activities at the subject camp were not under moving defendant's supervision or control and (5) the horse which moving defendant supplied to cross-complainant had no history of being unduly dangerous, nor evidenced a predisposition to behave in ways which added to the ordinary risk involved in horse riding or the handling of horses."

YES's separate statement of material facts relevant to the issues raised on appeal are that Bart Brown, owner of YES, provided Quarter and other horses to the Girl Scouts at Camp Lakota and it was his policy to send gentle horses to camp programs. Moreover, prior to June 30, 1998, he was unaware

---

[1]Plaintiff has also sued the San Fernando Valley Girl Scout Council (Girl Scouts), but that entity is not a party to this appeal.

[2]Plaintiff was born December 6, 1986, and thus was 11 years old when the incident occurred in June 1998.

of any complaints concerning Quarter or any instances in which Quarter exhibited dangerous propensities or caused injuries. In addition, following the injury to plaintiff, the Girl Scouts did not return Quarter to him and may have used Quarter again in the horse riding activities at Camp Lakota. The injury occurred while plaintiff was in the process of trying to tie Quarter with a quick release knot, and plaintiff did not observe the horse exhibiting any unusual movement when she went to tie him up in the stable. Quarter did not seem "hyper" to plaintiff before the subject incident, but plaintiff did not know if the horse made an unexpected move because she was concentrating on tying the knot at the time of the incident. According to her deposition, she did not see Quarter "spook" at or about the time of the incident.

Plaintiff's opposition to the MSJ argued that YES has provided horses and tack, including tying devices, to the Girl Scouts for use by camp attendees and counselors and that several of YES's horses, including Quarter "exhibited 'head-shyness,' a condition that exists when a horse hesitates or spooks because of motions toward or near its head." Plaintiff argued that a head-shy horse can "suddenly spook, rear, or as in the instant case pull back when being tied. Defendant was the sole care provider for his horses and knew or should have known of the dangerous propensities of each of the thirty horses he provided to Camp Lakota. Despite this knowledge of Quarter's dangerous propensity, Defendant delivered her to Camp Lakota for use with children."

Plaintiff claimed she had presented evidence that, contrary to Brown's declaration, YES had not always provided gentle horses to the camp and that Camp Lakota returned a horse that was too advanced for even the counselors. Moreover, in 1998, four of the 30 YES horses, included Quarter, had propensities to spook and pull back. She argued that, given Brown's experience with horses, his care for Quarter, and the fact that observation of a horse will allow an individual to determine whether a horse is head-shy, Brown must have known that Quarter was head-shy and dangerous for handling by children. Explaining Brown's alleged liability, plaintiff stated: "Defendant supplied the tack, including the lead ropes, that accompanied the horses. Quarter's uneven disposition and tendency to be head-shy joined with Bart Brown's use of a lead-rope instead of safer leash-type devices resulted in severe injury to Plaintiff's fingers. [¶] The nature of the relationship between Plaintiff and Defendant is clear; Defendant owed Plaintiff a duty to provide safe equipment and safe horses." Relating to supplying the horse to the camp, plaintiff claimed defendant either "knew or should have known" that Quarter had a dangerous propensity to pull back when being tied and his knowledge and Quarter's disposition were characterized as triable issues of material fact.

Arguing the law, plaintiff contended that primary assumption of the risk (see *Knight v. Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696]; *Ford v. Gouin* (1992) 3 Cal.4th 339 [11 Cal.Rptr.2d 30, 834 P.2d 724, 34 A.L.R.5th 769]; *Harrold v. Rolling J Ranch* (1993) 19 Cal.App.4th 578 [23 Cal.Rptr.2d 671]) did not bar her claim. In establishing the facts contrary to those asserted by defendant and upon which the alleged liability is based, plaintiff relied on the declaration of plaintiff's expert, Don Burt. Following the establishment of his expertise, which is uncontradicted, Don Burt's declaration stated:

"4. I am familiar with the relevant deposition testimony of Meghann Giardino, Daryle Ann Giardino, Bart Brown, Kelly Schirmer and Kassia Regehr.[3] I understand that the testimony of the camp wranglers revealed that Quarter, the horse involved in [plaintiff's] injury, was 'head shy.'

"5. A horse that is described as one that is head shy is one that is particularly sensitive to being approached and/or touched around the eyes and ears. *This condition develops early in the life of a horse and persists throughout the horse's life.* A head-shy horse is one that is know to pull back its head to avoid being touched around the head by an individual grooming the horse, tying the horse, or otherwise coming near the horse's head.

"6. A horse with the head-shy propensity is one that is more likely to panic, or 'spook,' while tied, or while being tied. Anything may cause a normal horse to panic; for example, another horse that comes too close, a startling sound, or a nearby rodent. This potential for panic is especially true for a horse with a dangerous propensity for head shyness.

---

[3]Plaintiff's counsel did not have access to a hard copy of the deposition transcripts of Kelly Schirmer and Kassia Regehr because the court reporter who attended those depositions had suffered a heart attack. However, counsel had attended the deposition and reviewed the videotapes and represented the contents of those depositions as follows:

Kelly Schirmer, born February 2, 1979, was a wrangler at Camp Lakota in 1998, her first year at the camp. Defendant gave the wranglers a single piece of paper with the names of the horses and a description of the horses' markings. The wranglers sent a few horses back "because the horses did not comply with what the wranglers wanted for the children." One of the horses sent back was "too advanced." Four of the 30 horses provided in 1998 had "a tendency to spook and pull back." *A couple of days before the accident, Quarter stopped* when walking toward the tie-up; after the incident, Schirmer believed Quarter to have a low tolerance for spooking and Schirmer "noticed that Quarter was head shy." Even after the accident, the camp kept using Quarter but left it to the wranglers to lead, tie, and saddle the horse. Schirmer believed Quarter was "flighty" while tacking up; Quarter spooked when hitting her foot on metal and by then they were using bailing twine to allow her to break free.

Kassie Regehr, born June 27, 1979, testified that in 1997 Quarter pulled back five to 10 times during eight weeks of camp and the riding director was aware of the pulling back. Ms. Regehr was the riding director in 1998; after the accident, the three wranglers would tie Quarter.

"7. Observation of a horse during grooming, tying, or leading will allow an individual to determine whether a hose is head shy. *This observation should be readily apparent to anyone with a moderate level of equestrian experience. The head-shy characteristic in a horse is not one that would be missed by an individual who regularly cares for such a horse.* Because horses tend to become more relaxed as they age, the panic reaction of a head-shy horse also tends to diminish as the animal ages. A horse displaying this characteristic into its late teens to early twenties most likely exhibited head shyness to a greater degree when younger.[4] *An individual with years of experience caring for a horse with this characteristic should be very familiar with this type of behavior.*

"8. *A horse that has been identified as a head-shy horse is not appropriate for use in an equestrian program involving children or the general public.* An animal displaying this dangerous characteristic is often removed from public contact to avoid the potential risk involved with caring for, and allowing people near such an animal. *A horse with this dangerous characteristic would not be suitable for a children's camp program.*

"9. Tying horses with lead ropes is a method not recommend[ed] for programs involving children. Only experienced individuals should be allowed to tie a horse to a rail using a lead rope. Experienced children should only be allowed to tie a horse using a lead rope and a quick release knot if they receive extensive instruction and practice under careful supervision while tying a steady horse that is not head shy.

"10. Other types of tying devices are better suited for use in children's equestrian programs including leads with a metal clip used to avoid the need to tie any knots where hands and fingers may be caught, or installing metal rings on the tie rails that prevent a rope from crushing a child's hand should a horse pull back while being tied. I have advised programs where children will be present to utilize these alternative tying devices for many years, and many programs around the country and around the world use such devices where children are concerned." (Italics added.)

According to plaintiff, she was tying the knot and asking a question. None of the counselors were readily available. As she was starting to "do the braid" that was part of the knot, she was pulling it through and "a second later I just noticed that my hand was like all bloody."

In addition to disputing defendant's facts, plaintiff relied on her expert's declaration and the depositions of Regehr and Schirmer to attempt to establish that counselors noticed as early as 1997 that Quarter was "head shy" and

---

[4]Defendant testified Quarter was in her late teens or early 20's in 1998 when the incident occurred.

nervous around tying rails; that Bart Brown owned and exclusively cared for Quarter from 1986 to 1999 and therefore must have known Quarter was "head shy"; and that he did not warn the wranglers or plaintiff that Quarter had a propensity to pull back when tied. Plaintiff disputed that the declaration and depositions established the facts claimed by defendant.

In reply, defendant filed a "consolidated responsive separate statement" as well as a declaration by counsel, with portions of the deposition testimony of Schirmer and Regehr. Defendant argued that plaintiff had failed to establish that Quarter was anything but a gentle horse and produced no facts that Brown had been advised of any problems with Quarter. Rather, according to defendant, the actual depositions of Regehr and Schirmer did not support the facts asserted by plaintiff regarding the nature of Quarter as "head shy." Defendant added that the expert's testimony did not address plaintiff's claim that the injury occurred when she was tying Quarter, thus failing to provide a causal link to plaintiff's injury.

### Hearing on the MSJ

The moving party began by arguing that, even if the horse was head-shy, "I think we have a causation issue that hasn't been sufficiently proven by defendant." That is, plaintiff argued there was no evidence that any tendency of the horse to be head-shy actually caused this incident.

Plaintiff conceded she did not oppose the MSJ on the fraud causes of action or punitive damages. Plaintiff argued that the causation issue was not properly before the court because it was not raised in the papers before the court. There was a request to have an opportunity to obtain additional expert declarations should the court want to reach the issue of causation.

The trial court granted the MSJ on all three causes of action as well as on the cross-complaint of the Girl Scouts. Explaining its ruling, the court found there was no evidence that the moving party provided any equipment to tie the horse. Insofar as liability was premised on providing an unsafe horse, the court acknowledged that plaintiff's expert could not examine the horse, which died in early 1999, but was "not sure" the expert's declaration was "enough to classify Quarter as unduly dangerous. First, Burt's characterization of Quarter being head-shy is based on those depositions by Regher and Schirmer, both counselors. [¶] Then Burt discusses what it means for a horse to be head-shy, and states that Brown, having at least a moderate level of equestrian experience and who regularly cares for Quarter, should have identified his characteristic."

The court noted a "problem" in that the counselors did not consider Quarter to be unduly dangerous and continued to use the horse at the Girl

Scouts camp even after the incident. In addition, there was "no evidence that moving party had any knowledge of any complaints concerning Quarter, or knowledge of any incident in which Quarter caused personal injury. [¶] And contrary to plaintiff's assertion, the Burt declaration does not dispute these facts."

The record indicates that the court reporter who reported the relevant depositions suffered a heart attack and was not able to provide hard transcripts as exhibits to plaintiff's opposition to the MSJ. Counsel and the court agreed that those transcripts could be filed later and incorporated as part of the opposition.[5]

The court granted the MSJ and entered judgment for defendant. Relating to a principal issue on appeal, the providing of a horse that was not unduly dangerous, the court stated: "Plaintiff argues that because a wrangler testified that Quarter had a propensity for pulling back when tied, and because plaintiff's expert characterized this conduct as head shy, that moving party knew of the horse's dangerous propensities and therefore breached his duty of not providing a horse that was unduly dangerous. The horse died in early 1999, so there is no way for the plaintiff's expert to examine the horse. Therefore, plaintiff's expert's declaration is based solely on the deposition testimony in this case and his personal experience with horses. The Court is not sure that Burt's declaration is enough to classify Quarter as unduly dangerous. First, Burt's characterization of Quarter as being head shy is based on those depositions by Regehr and Schirmer, both counselors. Then Burt discusses what it means for a horse to be head shy, and states that Brown, having at least a moderate level of equestrian experience and who regularly cares for Quarter, should have identified his characteristics. Burt states: 'That a horse is head shy, is not appropriate for use in an equestrian program involving children.'

"The Court has a problem with that testimony. Certain transcripts have been submitted in support of the Reply. The testimony generally shows that counselors did not consider Quarter to be unduly dangerous at the Girl Scout Camp. The camp continued to use the horse even after the incident.

"Finally, there is no evidence that moving party had any knowledge of any complaints concerning Quarter, or knowledge of any incident in which Quarter caused personal injuries. Contrary to plaintiff's assertion, the Burt declaration does not dispute these facts."

Plaintiff appeals from the notice of entry of judgment and order granting the MSJ. We shall treat the notice of appeal as an appeal from the judgment.

---

[5]Only brief portions of those depositions are part of the joint appendix.

Appellant contends the trial court erred in granting summary judgment because YES did not carry its evidentiary burden in that 1) plaintiff raised a triable issue of fact that YES was negligent; 2) plaintiff raised a triable issue of fact as to whether YES provided an unduly dangerous horse; 3) the trial court erred by weighing the conflicting evidence about Quarter; 4) the YES summary judgment motion addressed only the unduly dangerous horse issue; plaintiff introduced sufficient evidence to support a finding of negligence by YES on multiple grounds; and 5) assumption of the risk will not bar plaintiff's claim.

YES argues the applicability of primary assumption of risk to horseback riding activities and contends YES did not increase the risks inherent in horseback riding because Quarter was not an unduly dangerous horse. In addition, YES contends the evidence demonstrated that "head shyness," if any, did not cause plaintiff's injury.[6]

DISCUSSION

1. *Standard of review.*

■   The court in *Arnold v. Dow Chemical Co.* (2001) 91 Cal.App.4th 698, 707 [110 Cal.Rptr.2d 722], recently set forth the standard of review for summary judgments: "Summary judgment is granted if all the submitted papers show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established or that an affirmative defense to that cause of action exists. (Code Civ. Proc., § 437c, subd. (n); see *Rowe v. Superior Court* (1993) 15 Cal.App.4th 1711, 1724 [19 Cal.Rptr.2d 625].) Once the defendant's burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action. (Code Civ. Proc., § 437c, subd. (o).) The plaintiff must set forth specific facts showing that a triable issue of material fact exists. (*Ibid.*)

■   "In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. [Citation.] We must determine whether the facts, as shown by the parties,

---

[6]The trial court did not consider the issue of causation. Neither do we. The issue was not properly raised in the MSJ; if it is to be considered, plaintiff must be given an opportunity to counter with disputed facts.

give rise to a triable issue of material fact. [Citation.] In making this determination, the moving party's affidavits are strictly construed while those of the opposing party are liberally construed."[7]

■ Moreover, when an issue of assumption of the risk arises on summary judgment, "[t]he application of the affirmative defense of primary assumption of risk requires a legal conclusion that 'by virtue of the nature of the activity and the parties' relationship to the activity, the defendant owes no legal duty to protect the plaintiff from the particular risk of harm that caused the injury.' (*Knight, supra,* 3 Cal.4th at pp. 314-315.) Thus, the existence and scope of a defendant's duty of care is determined by the court, and determinations of the elements upon which the basis for the duty depends must be resolved as a matter of law by the court. Issues of law are reviewed by this court de novo. [Citations.] Accordingly, like the trial court, we analyze the nature of the . . . activity engaged in here and [the parties'] relationship to that activity in order to determine whether, 'as a matter of public policy, the defendant should owe the plaintiffs a duty of care.' [Citation.]" (*Shannon v. Rhodes* (2001) 92 Cal.App.4th 792, 795 [112 Cal.Rptr.2d 217]; see also *Bjork v. Mason* (2000) 77 Cal.App.4th 544, 547 [92 Cal.Rptr.2d 49], review den. [holding assumption of risk bars liability for some of defendant's actions, but broken tow rope he supplied is not an inherent risk of inner tubing].)

## 2. *Assumption of the risk.*

YES first argues that the evidence presented in the MSJ shows that Quarter was merely acting as a horse and that the doctrine of assumption of the risk should preclude recovery. Our Supreme Court in *Knight v. Jewett, supra,* 3 Cal.4th 296 and *Ford v. Gouin, supra,* 3 Cal.4th 339, set forth parameters of the doctrine. The facts in *Knight v. Jewett* revolve around injuries during halftime at a 1987 Super Bowl party. Several of the guests played an informal game of touch football. The defendant was playing roughly and Ms. Knight told him " 'not to play so rough or I was going to have to stop playing.' " (*Knight v. Jewett, supra,* 3 Cal.4th at p. 300.) Although the plaintiff and the defendant remembered the incident differently, the plaintiff and another woman on her team declared that the defendant caught a pass, ran toward the other woman, and ran into the plaintiff from behind, knocked her down, and stepped on her hand; he then continued running until he tagged the other woman, who declared the " 'tag was hard enough to cause me to lose my balance, resulting in a twisting or spraining

---

[7]Because we independently review the record, we need not consider plaintiff's contention that the trial court erred by weighing the conflicting evidence about Quarter rather than deciding whether a material issue of fact exists.

of my ankle.' " (*Id.* at pp. 300-301.) The plaintiff endured three operations, and her finger finally was amputated. She sued defendant for negligence and assault and battery. The defendant pleaded reasonable implied assumption of risk as a complete defense. (*Id.* at p. 301.) The Supreme Court granted review to decide "the proper application of the assumption of risk doctrine in light of the adoption of comparative fault principles in *Li* [*v. Yellow Cab. Co.* (1975)] 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393]." (*Knight v. Jewett, supra,* 3 Cal.4th 296, 303.) A plurality affirmed the defense judgment.

A plurality also affirmed a defense summary judgment in *Ford v. Gouin, supra,* 3 Cal.4th 339, where a water-skier injured when the back of his head struck a tree limb that extended over the channel from one of the riverbanks sued his friend who was driving the boat that towed the plaintiff, who had been skiing barefoot and backward. (*Id.* at p. 343.)

*American Golf Corp. v. Superior Court* (2000) 79 Cal.App.4th 30, 36 [93 Cal.Rptr.2d 683], summarized the conclusions courts have drawn from *Knight* and *Ford*: "Under the assumption of the risk doctrine, ordinarily a recreation provider owes no duty to a participant in an active sport to use due care to eliminate risks inherent in the sport. In *Knight v. Jewett, supra,* 3 Cal.4th 296, and its companion case *Ford v. Gouin*[*, supra,*] 3 Cal.4th 339 . . . , the Supreme Court distinguished between primary and secondary assumption of the risk. Primary assumption of the risk 'embodies a legal conclusion that there is "no duty" on the part of the defendant to protect the plaintiff from a particular risk . . . .' (*Knight v. Jewett, supra,* 3 Cal.4th at p. 308.) Therefore, if the doctrine applies, there is no duty and plaintiff's assumption of the risk acts as a complete bar to liability. (*Ibid.*) Secondary assumption of the risk, in contrast, refers to those instances in which the defendant owes a duty of care, but the plaintiff knowingly encounters a risk created by the breach of the duty. (*Id.* at p. 310.) Unlike primary assumption of the risk cases, secondary assumption of the risk cases are subsumed into the comparative fault scheme, and a plaintiff's assumption of the risk does not act as a bar to the action. (*Id.* at p. 315.)"

Following *Knight v. Jewett, supra,* 3 Cal.4th 296, the cases that do not apply assumption of risk principles to sporting activities are few and far between. (E.g., see cases collected at 6 Witkin, Summary of Cal. Law (2001 supp.) Torts, § 1090C, pp. 301-311; *Mastro v. Petrick* (2001) 93 Cal.App.4th 83, 87-91 [112 Cal.Rptr.2d 185].) *Harrold v. Rolling J Ranch, supra,* 19 Cal.App.4th 578, 580, on which both parties to this appeal rely, was one of several implied assumption of the risk cases remanded for reconsideration in

light of *Knight v. Jewett*. Like the case at bench, *Harrold* involved horseback riding. Plaintiff Harrold was thrown from her horse when she was taking off her jacket to loan it to a child who was also riding; the horse suddenly spooked. Ms. Harrold later discovered the same horse had spooked and thrown a rider when that rider took off and waved a hat. The defendants did not either warn the plaintiff of the prior incident or retrain the horse to avoid recurrence of a similar incident. The plaintiff sued for, inter alia, negligent failure to warn and failure to provide the plaintiff with a safe horse to ride. (*Id.* at p 582.) The defendant relied on the affirmative defense of assumption of the risk, arguing that by virtue of her experience as a rider, the plaintiff knew of the risks and voluntarily assumed such risks when she commenced the ride. (*Id.* at p. 583.)

In affirming summary judgment for the defendant, the *Harrold* majority, *supra*, 19 Cal.App.4th 578, 585, characterized the *Knight* plurality as requiring inquiry, not into the subjective knowledge of the plaintiff but into "the policy factors affecting the defendant's duty to the plaintiff in the context of this particular activity. The question is: Do riding stables in the business of renting horses to members of the general public for purposes of trail rides owe a duty of due care toward those who rent those horses?" Citing language from *Knight* regarding the obligation of the defendants " 'to use due care not to increase the risks to a participant over and above those inherent in the sport,' " the court concluded that commercial riding stables owe a narrow duty of due care (not applicable under the facts of *Harrold*) to those members of the general public who rent horses from them. (19 Cal.App.4th 578, 585-586, italics omitted.)

Discussing the facts before it, the *Harrold* court, stated: "Likewise, a whole host of duties can be ascribed to commercial providers of horse-riding facilities, i.e., not to provide faulty saddles, bridles and other equipment, not to provide dangerous trails, not to provide horses that are shodded poorly—and the list can go on and on. However, in this case we stop short of imposing a duty on stable owners to provide 'ideal' riding horses such that they never buck, bite, break into a trot, stumble or 'spook' when confronted by a frightening event on the trail such as a shadow or snake or react to peculiar movements of a rider such as excessive spurring or waving of a coat as in this case. We view sudden movements of a horse just as inherent in horseback riding as the presence of moguls on a ski slope are to skiers.

"Public policy supports not imposing a duty on commercial operators of horse-renting facilities which provide supervised trail rides, to supply 'ideal' horses, but we stop short of eliminating any duty such as a duty to warn of a dangerous propensity in a given horse. However, the one prior incident of

the subject horse having spooked does not rise to the level of a dangerous propensity, in our opinion. It does rise to the level of a 'horse behaving as a horse' with no incumbent duty on the part of the stable operator. In our opinion, to impose some sort of duty on a lessor of horses when a 'horse acts as a horse' is to tell the commercial world that strict liability is imposed for any action of a horse inherent in horseback riding, with the concomitant result that in all probability all commercial horseback riding will cease because of the risk involved to those that are self-insured or by reason of the prohibitive expense to obtain liability insurance for such an enterprise." (*Harrold v. Rolling J Ranch, supra,* 19 Cal.App.4th at p. 588.)

In concluding that the trial court was correct in finding the action barred by primary assumption of the risk, the *Harrold* court added: "we are unwilling and do not impose on purveyors of horse rides a duty when a horse 'acts' as a horse, any more than we would impose a general duty on commercial small boat operators when a wave suddenly moves a boat causing a passenger to be unbalanced and injured." (*Harrold v. Rolling J Ranch, supra,* 19 Cal.App.4th at p. 589.)

A contrary result was reached in *Tan v. Goddard* (1993) 13 Cal.App.4th 1528 [17 Cal.Rptr.2d 89], where a student jockey was assigned a lame horse to ride on an unsafe track. The horse fell, and the student was injured. The Court of Appeal held that the jockey instructor had a duty "of ordinary care to see to it that the horse he assigned [to the injured student] to ride was safe to ride under the conditions he prescribed for that activity. His failure to do so is analogous to the example, cited in *Knight,* of the duty of the ski resort operator to use due care to maintain its towropes in a safe condition." (*Id.* at pp. 1535-1536.) Reversing summary judgment against the student, Justice Epstein's opinion in *Tan v. Goddard* relied in large part on the duty of an instructor towards a student. (See also *Galardi v. Seahorse Riding Club* (1993) 16 Cal.App.4th 817 [20 Cal.Rptr.2d 270] [student injured when an instructor set up horse jumps which were allegedly beyond the capabilities of the student and the horse; question of fact as to liability]; but see *Allan v. Snow Summit, Inc.* (1996) 51 Cal.App.4th 1358 [59 Cal.Rptr.2d 813] [instructor not liable to novice skier who suffered herniated discs while falling numerous times skiing down icy slope].)

On the other hand, even children and students are sometimes barred by the assumption of risk doctrine. The 13-year-old swimmer in *Lupash v. City of Seal Beach* (1999) 75 Cal.App.4th 1428, 1431 [89 Cal.Rptr.2d 920], tripped and fell into the ocean during the final event of a junior lifeguard competition; the accident happened about five to 10 seconds after Lupash ran down the beach and into the water. He stepped into " 'something like a hole,' " lost

his balance, fell facedown, and as a result became a quadriplegic. The *Lupash* court resisted a finding of a duty by the public entity "to hold back the power of the sea. They are not responsible for natural hazards and owe no duty to warn beachgoers, or even children in city-sponsored junior lifeguard programs, against breaking waves and an uneven ocean floor. [¶] The record in this case shows no evidence that defendants increased the inherent risk of harm of ocean athletics. The court did not err in granting a nonsuit, and we affirm accordingly." We note that, unlike plaintiff in the case at bench, a novice rider, plaintiff Lupash was "an accomplished swimmer and a distance freestyler" and "had swum competitively since he was eight years old. He swam nearly every day, participating in one or two meets a month." (*Ibid.*)

■ Given the facts presented in the MSJ, we conclude that assumption of the risk does not bar plaintiff's lawsuit against Brown and YES, which provided Quarter to the Girl Scout camp. YES had provided horses to the camp in the past and either was or should have been aware of the levels of riding experience of the youngsters who would be riding those horses. Plaintiff was a youngster at her first week of Girl Scouts camp and apparently had no previous experience with horses. (Cf. *Harrold v. Rolling J Ranch, supra*, 19 Cal.App.4th 578, 583 [where the adult plaintiff had ridden in the past.])[8] There may be no duty to provide "ideal" horses to a children's camp; it is as impossible to prevent a horse from ever "spooking" as to "hold back the power of the sea" in *Lupash*. Nevertheless, there is a duty at least not knowingly or without due care to provide horses inappropriate for beginning riders to a children's camp for novice riders. We cannot find that inexperienced children riding at camp for the first time assume the risk of horses that are inappropriate for their skill level.

---

[8]Furthermore, the analysis in Justice Johnson's dissent in *Harrold v. Rolling J Ranch, supra*, 19 Cal.App.4th 578, 589-595, has much to commend it. For example, after the nature of the provider's duty regarding the provision of horses for an "afternoon trail ride," not "a wild and woolly ride on untamed beasts" (*id.* at pp. 589-590), he poses a series of questions: "How many riders does a horse get to throw before the animal is deemed to be an inappropriate mount for amateurs taking an afternoon trail ride? [¶] And how many such bucking incidents does it take before the horse's commercial owner has a duty to warn the unlucky amateur rider about the horse's proclivities? [¶] And, finally, and of special relevance to the summary judgment motion, how many unlucky riders does a plaintiff have to produce at the summary judgment stage to create a triable issue the horse possesses a disposition which is incompatible with service on trail rides or at a minimum requires the chosen riders be warned? Isn't there at least a triable issue that a horse who has spooked and bucked off at least one rider is unsuitable for this purpose?" (*Id.* at p. 592, italics omitted.)

We also may disagree with the analysis in certain other assumption of the risk cases. (See, e.g., *Balthazor v. Little League Baseball, Inc.* (1998) 62 Cal.App.4th 47, 51 [72 Cal.Rptr.2d 337] [Little Leaguer assumes the risk of being struck by wild pitch, three minutes before sunset with no lights on the playing field and game is not called for diminished lighting].) Nevertheless, the case at bench is distinguishable on its facts from *Harrold* and *Balthzor*.

If it can be shown that YES increased the risk of harm to plaintiff above that normally associated with learning to ride horses at a Girl Scout camp, by either providing a horse inappropriate to the skill level of the novice riders or failing to warn of the horse's unusual and unsafe disposition, the doctrine of assumption of the risk does not apply. We next discuss whether the papers supporting the MSJ will allow a finding that in providing Quarter to the Girl Scout camp, YES was negligent and/or Quarter was an unduly dangerous horse. Although the question is a close one, we conclude the papers raise a material issue of fact and summary judgment was improperly granted. We explain.

3. *Although the evidence is conflicting, there is evidence that Quarter was an inappropriate horse for beginners and YES knew or should have known of the horse's characteristics.*

The declaration of plaintiff's expert establishes that a horse that is head-shy is inappropriate for children and that the condition of being head-shy develops early in the life of a horse and is apparent to those like Quarter's owner with equestrian experience. As expert Don Burt stated:

"5. A horse that is described as one that is head shy is one that is particularly sensitive to being approached and/or touched around the eyes and ears. *This condition develops early in the life of a horse and persists throughout the horse's life.* A head-shy horse is one that is known to pull back its head to avoid being touched around the head by an individual grooming the horse, tying the horse, or otherwise coming near the horse's head.

"6. *A horse with the head-shy propensity is one that is more likely to panic, or 'spook,' while tied, or while being tied.* Anything may cause a normal horse to panic; for example, another horse that comes too close, a startling sound, or a nearby rodent. *This potential for panic is especially true for a horse with a dangerous propensity for head shyness.*

"7. Observation of a horse during grooming, tying, or leading will allow an individual to determine whether a hose is head shy. *This observation should be readily apparent to anyone with a moderate level of equestrian experience The head-shy characteristic in a horse is not one that would be missed by an individual who regularly cares for such a horse.* Because horses tend to become more relaxed as they age, the panic reaction of a head-shy horse also tends to diminish as the animal ages. A horse displaying this characteristic into its late teens to early twenties most likely exhibited head shyness to a greater degree when younger. *An individual with years of experience caring for a horse with this characteristic should be very familiar with this type of behavior.*

"8. *A horse that has been identified as a head-shy horse is not appropriate for use in an equestrian program involving children or the general public.* An animal displaying this dangerous characteristic is often removed from public contact to avoid the potential risk involved with caring for, and allowing people near such an animal. *A horse with this dangerous characteristic would not be suitable for a children's camp program.*" (Italics added.)

Much of the argument on appeal is whether the MSJ contains sufficient evidence to raise a triable issue of material fact that Quarter was actually head-shy and/or that defendant knew or should have known of that condition. Plaintiff's expert had not examined Quarter, presumably because the horse was reported to have died in 1999. Paragraph 4 of the expert's declaration explains that he was familiar with the relevant deposition testimony of Schirmer, Regehr, and others and understood "that the testimony of the camp wranglers revealed that Quarter . . . was 'head-shy.'" Based on respondent's reading of the relevant depositions, YES challenges the conclusion that those depositions permit a finding that Quarter was head-shy.

Plaintiff's counsel declared familiarity with the pertinent depositions and attendance at the depositions of Schirmer and Regehr on July 26, 2000. Although the court reporter for those two depositions had suffered a heart attack and could not complete the transcripts in a timely fashion for use in the MSJ proceedings, counsel reviewed the videotapes of the depositions. Among counsel's recollections was that after the accident "Schirmer noticed that Quarter was head shy." If that was Schirmer's deposition testimony, plaintiff's expert was reasonable in relying on her evaluation of the horse and in concluding, based on his own expertise, that such a condition developed early in a horse's life and should have been observed by defendant.

Only a small portion of the deposition transcripts was attached to YES's reply. Although YES characterizes the deposition testimony as establishing that Quarter was "just acting like a horse" and was fit for children, and the depositions would support such a finding, when combined with the testimony of plaintiff's expert, contrary inferences can also be drawn. For example, Ms. Schirmer declared that Quarter's action in pulling back was "unusual," though "a lot of horses do it." Ms. Regehr remembered that Quarter "would sometimes" pull back the year before the accident, perhaps five to 10 times during the eight-week 1997 summer camp. She added: "Some horses have bad experiences. And so when they see like a hitching rail or something to tie up to, they get scared and pull back." This was a normal part of working with horses and some pull back while others do not. "Some haven't had the same experiences so they trust you more. And so

they'll just stand." She thought Quarter was fit for beginners to ride; she also testified Quarter was safe for children to lead from the pen to a hitching rail and for them to tie to a hitching rail "under supervision."

We conclude plaintiff has successfully raised material issues of fact as to whether Quarter's disposition was unsafe to beginning riders, was known or should have been known to defendant, and whether that disposition increased the inherent risk for a child to be involved in a beginning horseback riding program. Those issues, like assumption of the risk, are close ones on the record before us. However, applying the appropriate standards of review for questions of law and fact, we conclude that summary judgment should not have been granted.

### DISPOSITION

The judgment is reversed. Respondent is to bear costs on appeal.

Rubin, J., and Boland, J., concurred.