Filed 8/14/23  Browne v. Foxfield Riding School CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| AVA BROWNE, a Minor, etc., et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>FOXFIELD RIDING SCHOOL et al.,<br><br>    Defendants and Respondents. | 2d Civil Nos. B315743, B318304<br>(Super. Ct. No. 56-2017-00499800-CU-PO-VTA)<br>(Ventura County) |

    Ava Browne, through her mother, Kelly Browne,[1] sued Foxfield Riding School and riding instructor Katelyn Puishys (collectively, Defendants) for ordinary and gross negligence after she was injured during a horseback riding accident.  The trial court granted Defendants' motion for nonsuit as to ordinary

---

[1] We refer to the Brownes by their first names to avoid confusion.  No disrespect is intended.

negligence, and a jury found in favor of Defendants on the gross negligence claim. The court awarded costs to Defendants.

The Brownes appeal from the judgment and contend the trial court erred when it: (1) granted partial nonsuit as to ordinary negligence, (2) instructed the jury on gross negligence, (3) made certain evidentiary rulings, (4) made cumulative errors, and (5) awarded Defendants costs pursuant to Code of Civil Procedure[2] section 998. As we explain below, the trial court erred in granting partial nonsuit on the ordinary negligence claim but did not err with respect to its evidentiary rulings and instructing the jury. We therefore affirm in part, reverse in part, and remand for further proceedings.

FACTUAL AND PROCEDURAL HISTORY

Ava was 12 years old when Kelly enrolled her in Foxfield's summer sleepaway camp. Kelly completed and signed Ava's application. In the application, Kelly indicated Ava had prior experience in horseback riding, including jumping crossrails. The application also stated that Ava was a "Level 3" rider at Mill Creek Riding School. A "Level 3" rider at Mill Creek would have been taught how to "jump horses, with multiple jumps," and how to control a horse's speed from walking slowly "all the way to canter." Such a rider would also have been introduced to bigger and wider jumps.

In the application, Foxfield included the following release:

"I have sufficient knowledge of horses to understand their unpredictability and potentially dangerous character in general[,] and I understand that the use,

---

[2] Further unspecified statutory references are to the Code of Civil Procedure.

2

handling[,] and riding of a horse ALWAYS involves risk of bodily injury to anyone who handles or rides horses, as well as the risk of damaging the property of others. I understand that any horse, irrespective of its training and usual past behavior and characteristics, may act or react unpredictably at times, based upon instinct or fright, which likewise is an inherent risk assumed by one who handles/rides horses. I expressly assume such risk and hereby waive any claims that I might have against Foxfield Riding School, its [t]eachers, [c]ounselors[,] and [t]rainers, on behalf of the above[-]mentioned camper or myself. I agree to pay all doctor or hospital fees if the child is injured while staying at Foxfield."

Foxfield evaluated Ava on the first day of camp and placed her in the group with the least advanced riders. On the first and second days of instruction, Ava rode a horse named Polly in an enclosed dressage ring. Ava felt comfortable riding Polly.

On the third day of instruction, Foxfield assigned Ava a horse named Sonny, and Puishys taught the lesson. Ava rode Sonny in the dressage ring for about an hour and practiced some jumps. The group then went into the cross-country field. Ava completed her first jump with Sonny in the field, but fell off on her second jump, the "log jump." Sonny bucked during the jump, and Ava was thrown off and landed on her back. Puishys continued with the riding lesson while Ava walked back to the cabins by herself.

Ava called Kelly from camp, and Kelly took her home. The next day, Ava had an X-ray done on her neck. She suffered a spinal injury requiring emergency surgery.

The Brownes sued Defendants for negligence/gross negligence. They alleged Defendants breached their duty of care

by assigning Ava to ride Sonny, a horse "unfit and unsafe for riding by a beginning rider like Ava." They also alleged Defendants failed to adequately instruct Ava before requiring her to ride in the cross-country field, which was beyond her abilities.

At trial, Ava testified she was nervous about riding Sonny. While riding in the dressage ring, she had difficulty controlling Sonny and told Puishys she needed instructions. Puishys "brushed it off." Ava was also nervous about riding in the cross-country field and told Puishys she could not do it. Puishys told Ava to "face [her] fears."

Another camper in Ava's group testified that Ava was having problems controlling Sonny right before the log jump. She said that Sonny seemed to "want[] to go fast" and that he was "hard to control."

The Brownes also presented deposition testimony of Foxfield's owner, who testified that it was not typical for dressage ring riders to be taken into the cross-country field on their third day of instruction.

Phyllis Pipolo, Ava's previous riding instructor, testified that Ava's balance was "slightly ahead of the center of gravity" and "slightly out of the rhythm of the horse." She questioned Ava's stability and said Ava had issues with "a lack of control."

The Brownes' expert witness, Linda Rubio, inspected Foxfield's facilities, observed Foxfield's horses, interviewed the Brownes, reviewed deposition testimony, and watched videos of Ava's riding. Rubio opined Ava was a beginning level rider and that Sonny was not a suitable horse because he was "an advanced horse." She also opined the lesson plan on the day of the accident with Ava riding Sonny was not an appropriate plan for Ava because it "increase[d] the risk over and above those inherent [in]

4

horseback riding." Rubio said Ava should not have gone into the cross-country field because it was "beyond her scope of capability." According to Rubio, Foxfield increased the risk of Ava falling off the horse by putting her in the field and having her attempt the log jump.

After the Brownes' case-in-chief, Defendants moved for nonsuit based on the primary assumption of risk doctrine and Foxfield's release of liability. The trial court granted the motion as to the issue of ordinary negligence, but denied it as to gross negligence. The court found that the signed release "was specific" and "very broad." It found the release "encompassed every one of the activities that the plaintiff engaged in, including but not limited to the activity of cross[-]country field jumping at the time the injury occurred. [¶] So clearly, primary express assumption of the risk has been established as a matter of law. There's nothing for the jury to resolve in that regard."

The trial proceeded on the issue of gross negligence, and the jury returned a verdict in favor of the Defendants. After partially granting the Brownes' motion to strike and tax costs, the trial court awarded nearly $97,000 in costs to Defendants.

## DISCUSSION

### *Partial nonsuit*

The Brownes contend the trial court erred when it granted a partial nonsuit as to ordinary negligence. They contend the release did not "clearly and unambiguously" release claims arising from Defendants' negligent conduct, which increased the inherent risks of horseback riding. Alternatively, they argue the release was void for a lack of meeting of the minds. We agree the trial court erred in interpreting the release and granting partial nonsuit.

5

" 'A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in [their] favor.' [Citation.] In determining the sufficiency of the evidence, the . . . court must not weigh the evidence or consider the credibility of the witnesses. Instead, it must interpret all of the evidence most favorably to the plaintiff's case and most strongly against the defendant, and must resolve all presumptions, inferences, conflicts, and doubts in favor of the plaintiff. If the plaintiff's claim is not supported by substantial evidence, then the defendant is entitled to a judgment as a matter of law, justifying the nonsuit." (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541.) We review the trial court's ruling on a nonsuit de novo. (*Id.* at pp. 1541-1542.)

To prevail on a cause of action for ordinary negligence, a plaintiff must prove the defendant owed them a legal duty, breached that duty, and proximately caused their injury. (*Benedek v. PLC Santa Monica, LLC* (2002) 104 Cal.App.4th 1351, 1356 (*Benedek*).) Although a defendant generally has a duty " 'not to cause an unreasonable risk of harm to others [citation], some activities—and, specifically, many sports—are inherently dangerous. Imposing a duty to mitigate those inherent dangers could alter the nature of the activity or inhibit vigorous participation.' [Citation.] The primary assumption of risk doctrine, a rule of limited duty, developed to avoid such a chilling effect. [Citations.] Where the doctrine applies to a recreational activity, operators, instructors[,] and participants in the activity owe other participants only the duty not to act so as to increase the risk of injury over that inherent in the activity." (*Nalwa v. Cedar Fair, L.P.* (2012) 55 Cal.4th 1148, 1154, italics

6

omitted; see also *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1005-1006 [coach has duty to not increase risk of harm inherent in learning a sport].) A written release may exculpate a defendant by negating that duty. (*Benedek*, at p. 1356.)

" 'Contract principles apply when interpreting a release.' " (*Cohen v. Five Brooks Stable* (2008) 159 Cal.App.4th 1476, 1483 (*Cohen*).) Where, as here, the interpretation of a release does not turn on the credibility of extrinsic evidence, " ' " 'construction of the instrument is a question of law . . . . It therefore follows that we must independently determine whether the release in this case negated the duty element of plaintiff[s'] cause[] of action." ' " (*Ibid.*)

The scope of a release is determined by its express language. (*Benedek*, *supra*, 104 Cal.App.4th at p. 1357.) "The express terms of the release must be applicable to the particular negligence of the defendant, but every possible specific act of negligence . . . need not be spelled out in the agreement." (*Ibid.*) " ' "It is only necessary that the act of negligence, which results in injury to the releasor, be reasonably related to the object or purpose for which the release is given." ' " (*Ibid.*)

To be effective, a "release 'must be clear, unambiguous, and explicit in expressing the intent of the subscribing parties.' " (*Benedek*, *supra*, 104 Cal.App.4th at p. 1356.) Thus, where the primary assumption of risk doctrine applies, the release must clearly and unambiguously exempt the defendant from liability from their own misconduct or negligent acts that increase the risks inherent in the activity. (*Cohen*, *supra*, 159 Cal.App.4th at p. 1488.) It must be sufficiently clear and explicit to " 'set forth to an ordinary person untrained in the law that the intent and

7

effect of the document is to release . . . claims for [their] own personal injuries and to indemnify the defendants from and against liability to others [that] might occur in the future.' " (*Ibid.*) "If an ambiguity as to the scope of the release exists, it should normally be construed against the drafter." (*Benedek*, at p. 1357.)

The express language of the release here does not "clear[ly], unambiguous[ly], and explicit[ly]" relieve Defendants of liability resulting from their own negligence or for conduct that increased the risks inherent in horseback riding. (*Benedek, supra*, 104 Cal.App.4th at p. 1356.) The release informed Kelly that the "use, handling[,] and riding of a horse ALWAYS involves risk of bodily injury to anyone who handles or rides horses" and that "any horse . . . may act or react unpredictably at times, . . . which likewise is an inherent risk assumed by one who handles/rides horses." By signing the release, Kelly "expressly assume[d] *such* risk and . . . waive[d] any claims that [she] might have against" Foxfield and its teachers. (Italics added.) But nothing in the release mentions negligence, negligent acts, or misconduct by the Defendants. Nor does the release inform an ordinary person untrained in the law that it would apply to Defendants' negligent conduct or conduct that increases the risks inherent in horseback riding. (See *Cohen, supra*, 159 Cal.App.4th at pp. 1488-1489.) Rather, the only assumption of risk mentioned in the release pertains to the inherent risks of handling or riding a horse.

The release does state that Kelly "waive[s] any claims that [she] might have against [Defendants]" and that she "agree[s] to pay all doctor or hospital fees" if Ava was injured at Foxfield. But we do not read these statements in isolation. Instead, we must interpret the release as a whole and its language in context,

avoiding a piecemeal, strict construction. (Civ. Code, § 1641; *Segal v. Silberstein* (2007) 156 Cal.App.4th 627, 633.) Read in context, the waiver language appears in the same sentence as the releasee's assumption of inherent risks. Thus, we interpret it to encompass only those injuries resulting from the inherent risks of riding or handling of horses, not injuries resulting from Defendants' alleged negligent acts.[3] It is not a waiver of all liability. (Cf. *Benedek*, *supra*, 104 Cal.App.4th at p. 1358 [release of all liability where release clearly and explicitly stated that it applied to "liability for *any* personal injuries suffered while on [defendant's] premises" (italics added)]; *National & International Brotherhood of Street Racers, Inc. v. Superior Court* (1989) 215 Cal.App.3d 934, 936 [release expressly provided that plaintiff was "not to sue [defendants] . . . from any and all claims and liability arising out of . . . ordinary negligence"].)

This case is like *Cohen*, *supra*, 159 Cal.App.4th 1476. There, the plaintiff was injured when she fell off a horse during a horseback ride. (*Id.* at p. 1480.) She then sued the defendants for negligence for allegedly increasing the risk inherent in trail riding when the guide accelerated the gait of the horses without warning, causing her to lose control and fall off her horse. (*Ibid.*) The defendants moved for summary judgment on the ground that the plaintiff signed a release. (*Id.* at p. 1481.) The release informed the plaintiff of the inherent risks of horseback riding,

---

[3] Even if the waiver language were ambiguous, we would construe such ambiguities against Foxfield, the drafter of the release. (*Benedek*, *supra*, 104 Cal.App.4th at p. 1357; Civ. Code § 1654; see also *Lund v. Bally's Aerobic Plus, Inc.* (2000) 78 Cal.App.4th 733, 738 ["release forms are to be strictly construed against the defendant"].)

including that a horse will run or bolt uncontrollably without warning. By signing the release, she agreed to " ' assume responsibility for the risks identified herein and those risks not specifically identified.' " (*Id.* at pp. 1485-1486, italics omitted.) The trial court granted summary judgment, finding the release clearly expressed an agreement not to hold the defendants liable for negligence. (*Id.* at p. 1482.)

The Court of Appeal reversed, concluding the trial court erred in interpreting the release. (*Cohen*, *supra*, 159 Cal.App.4th at p. 1487.) It explained that all the risks specifically described in the release were ones inherent in horseback riding. (*Id.* at p. 1486.) The risk of injury caused by the defendants' negligence was not within the scope of the release because a release requires "a high degree of clarity and specificity . . . in order to find that it relieves a party from liability for its own negligence." (*Id.* at p. 1488.) And " '[n]othing in the [r]elease clearly, unambiguously, and explicitly indicate[d] that it applie[d] to risks and dangers attributable to [the defendants'] negligence or that of an employee that may not be inherent in supervised recreational trail riding. Nor [did] the [r]elease indicate that it cover[ed] any and all injuries arising out of or connected with the use of [the defendants'] facilities.' " (*Id.* at p. 1489, italics omitted.) The same is true here.

Defendants rely on *Eriksson v. Nunnink* (2015) 233 Cal.App.4th 708 and *Brown v. El Dorado Union High School Dist.* (2022) 76 Cal.App.5th 1003 (*El Dorado*), two cases where a release in the recreational sports context was found to relieve the defendants from liability for their negligent conduct. But these cases are distinguishable. In *Eriksson*, the release between a plaintiff (a horseback rider) and the defendant (trainer) expressly

10

stated that the "[r]ider agree[d] to hold [the trainer] . . . completely harmless and not liable and release [her] from all liability whatsoever, and AGREE[D] NOT TO SUE [her] on account of or in connection with any claims, causes of action, injuries, damages, costs[,] or expenses arising out of [the rider's] use of [the trainer's] services . . . , including[,] without limitation, those based on death . . . [or] bodily injury, . . . except if the damages [were] caused by the direct, willful[,] and wanton negligence of the [t]rainer." (*Ericksson*, at p. 720.) The release also stated that the "[r]ider agree[d] to indemnify [the trainer] against, and hold her harmless from, any and all claims, causes of action, damages, judgments, costs[,] or expenses . . . [that] in any way [arose] from [the rider's] use of [the trainer's] services." (*Ibid*.) The *Eriksson* court held that this release "plainly encompasse[d] liability for *future* negligence as well as any previously committed torts," with the only exception to damages caused by gross negligence. (*Id*. at pp. 722-723.)

Similarly, in *El Dorado*, the language of the release between a student athlete and a school district expressly absolved the school district and its employees "from any and all claims of liability arising out of their negligence, or any other act or omission [that] cause[d] . . . illness, injury, death[,] or damages of any nature in any way connected with the student's participation in the school[-]related activity." (*El Dorado*, *supra*, 76 Cal.App.5th at p. 1010.) The court held that such language provided an "unequivocal[] agree[ment] to assume the risk of injuries caused by the negligent acts of the [d]istrict employees . . . while [the student] played football." (*Id*. at p. 1025.)

Unlike *Ericksson* and *El Dorado*, Foxfield's written release did not clearly and expressly apply to Defendants' negligent

11

conduct, nor did it waive all liability.  The only risks the Brownes assumed was related to the inherent risks of horseback riding. They did not assume liability attributable to Defendants' negligence or conduct that increased the inherent risks in horseback riding.  Nonsuit should have been denied.[4]

At oral argument Defendants argued the trial court's grant of nonsuit on the ordinary negligence claim was harmless. Because the jury found in their favor on the gross negligence claim, Defendants posit, the jury necessarily rejected the Brownes' theory that Defendants "unreasonably increased the risk to Ava over and above those already inherent in horseback riding."  But the jury was only asked to render a verdict on gross negligence, which requires " ' " 'the want of even scant care or an extreme departure from the ordinary standard of conduct.' " ' " (*County of San Diego v. Superior Court* (2015) 242 Cal.App.4th 460, 474.)  We do not know whether the jury would have found for the Brownes on a claim that only required finding that Defendants breached a legal duty that proximately caused Ava's injuries.  We thus cannot say that the grant of nonsuit was harmless.

---

[4] Because we conclude the trial court erred in interpreting the release, we need not address the alternative argument that the release was void.  And because we do not resolve that issue, we deny the Brownes' request for judicial notice as irrelevant to our decision.  (*State Comp. Ins. Fund v. ReadyLink Healthcare, Inc.* (2020) 50 Cal.App.5th 422, 442.)

*Jury instruction for gross negligence*

The Brownes next contend the trial court prejudicially erred when it denied their proposed modification to CACI 425. We disagree.

CACI 425 states: "Gross negligence is the lack of any care or an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to oneself or to others. [¶] A person can be grossly negligent by acting or failing to act." The Brownes requested a modification to specify that " 'if a defendant acts or fails to act in a manner which [*sic*] substantially or unreasonably increases the risk of danger or harm inherent in the sporting activity, such conduct constitutes gross negligence if you find that said defendant's act or failure to act demonstrates the lack of any care or an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to oneself or others.' " The trial court denied the proposed modification and instructed the jury with CACI 425, but allowed the Brownes to argue their expanded definition of gross negligence during closing arguments.

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case . . . [that] is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) Where a civil jury instruction error is alleged, reversal is only appropriate if after examination of the entire cause, the " 'error complained of has resulted in a miscarriage of justice.' [Citation.]" (*Id.* at p. 580.) To assess prejudicial instructional error, we evaluate: "(1) the state of the evidence, (2)

13

the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580-581.)

Here, even if the trial court erred in denying the modified instruction, the Brownes do not show they were prejudiced. During closing argument, the Brownes argued that Defendants were grossly negligent when they "unreasonably increased the risk to Ava over and above those already inherent in horseback riding." The Brownes presented evidence to support this theory and summarized the evidence during closing argument. They also argued the jury could find Defendants grossly negligent if the evidence proved Defendants' conduct, including the failure to act, "was a substantial factor in causing harm to Ava" irrespective of the release.

The trial court also clarified the gross negligence standard by instructing the jury that an "act or omission by the defendants [that] substantially or unreasonably increases the risk inherent in horseback riding and jumping can be gross negligence if it meets the definition of gross negligence. That is, it has to have amounted to . . . the want of any care or an extreme departure from conduct that would otherwise be reasonable." The Brownes point to no other instructions that would have affected the jury's understanding of gross negligence. Furthermore, there was no indication by the jury that it was confused or misled. (*Soule*, *supra*, 8 Cal.4th at pp. 580-581.) Thus, the court did not prejudicially err in denying the requested modification.

*Evidentiary errors*

Next, the Brownes argue the trial court erred when it: (1) excluded evidence regarding Foxfield's lack of proper licensure and accreditation, and (2) did not permit Pipolo to testify as an

14

expert witness.  We review these rulings for abuse of discretion (*Pannu v. Land Rover N. Am., Inc.* (2011) 191 Cal.App.4th 1298, 1317), and reject the Brownes' arguments.

### 1.  Licensure and accreditation

Defendants moved in limine to exclude evidence regarding Foxfield's lack of proper licensure and accreditation as a sleepaway camp because it was more prejudicial than probative.  The trial court granted the motion.  The Brownes argue that was error because the evidence was probative to show the release was void for a lack of meeting of the minds—i.e., that Kelly would not have signed the release if she had known Foxfield was not properly licensed and accredited.  We do not resolve this argument because even if the evidence was probative to the release being void, its exclusion was harmless given our conclusion that the release only applied to injuries resulting from the inherent risks of horseback riding and not to the negligence claims.

### 2.  Pipolo's testimony

At trial, Defendants objected to Pipolo's testimony that Ava was a "beginner" rider because Pipolo was not an expert and could not opine on Ava's skill level.  The court sustained the objection but allowed Pipolo to testify about her observations of Ava's riding.

There was no abuse of discretion.  Pipolo was a lay witness and could only offer opinion testimony if it was "[r]ationally based on her perception" and "[h]elpful to a clear understanding of [her] testimony."  (Evid. Code, § 800.)  In contrast, an expert could properly testify to an opinion related to "a subject that is sufficiently beyond common experience" and based on their special knowledge, skill, experience, training, or education.

(Evid. Code, § 801.)  An assessment of a horse rider's skill level is related to a subject matter beyond common experience and thus required an expert opinion.  (See, e.g., *Giardino v. Brown* (2002) 98 Cal.App.4th 820, 826.)

Any error in disallowing Pipolo to opine that Ava was a "beginner" rider also would have been harmless.  Pipolo was permitted to describe her observations of Ava's riding abilities, including observations on Ava's issues with stability and control.  Rubio also testified that Ava was a beginning rider.  And there was no dispute Ava was classified in the lowest skill group at Foxfield.  Excluding Pipolo's opinion thus did not prejudice the Brownes.

### *Cumulative error*

The Brownes argue cumulative error.  Because we have determined the trial court erred in granting nonsuit on the ordinary negligence claim, this matter must be reversed.  To the extent the Brownes argue the remaining issues resulted in cumulative error, our rejection of each of them forecloses their claim.  (*People v. Avila* (2006) 38 Cal.4th 491, 608.)

### *Section 998 costs award*

Lastly, the Brownes contend the costs awarded to Defendants pursuant to section 998 should be vacated.  Section 998 provides that if "an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover [their] postoffer costs and shall pay the defendant's costs from the time of the offer."  (§ 998, subd. (c)(1).)  Because we reverse and remand the matter on the issue of ordinary negligence, the Brownes can potentially obtain a more favorable judgment or award on remand.  We accordingly vacate the costs award.

16

## DISPOSITION

The judgment is reversed with respect to the nonsuit on the ordinary negligence claim, and the section 998 costs award is vacated.  The matter is remanded for further proceedings consistent with this opinion.  In all other respects, the judgment is affirmed.  The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED.


BALTODANO, J.


I concur:


GILBERT, P. J.

YEGAN, J., Dissenting:

I respectfully dissent. The majority opinion erases mother's name from the waiver and release document. We should not do that. "The purpose of the law of contracts is to protect the reasonable expectations of the parties." (*Ben-Zvi v. Edmar Co.* (1995) 40 Cal.App.4th 468, 475.) Mother knew and knows that riding a horse is dangerous and that people can be seriously injured when riding a horse. Mother agreed to accept this risk for her daughter. To be sure, she did not actually expect that daughter would be hurt but she knew, or should have known, that this was a foreseeable risk. The riding school had a reasonable expectation that it would not be the subject of a lawsuit based on a claim of negligence. These reasonable expectations should account for something.

The trial court expressly ruled that the waiver and release document was "very specific" and "very broad." I agree with the trial court. The activity that led to minor's harm was riding a horse and jumping a barrier in a country field. Minor was not a first time rider. She had ridden and jumped horses at another riding facility. She indicated on her application that she had experience at horse jumping. How could riding and jumping a horse not be covered by the release? Just what is the effect of mother's signature on the release directed to? And the last line of the waiver and release document that mother signed could not be more explicit: "I agree to pay all doctor or hospital fees if [my] child is injured while staying at Foxfield [riding academy]." This last sentence is in no way ambiguous and a reasonable person can only read it as a release of any obligation of riding school to pay these fees.

The nature of incremental and progressive teaching to achieve proficiency in sporting activities, is pretty basic. A professional surfing instructor does not start teaching on a 35-foot-wave at Waimea Bay. A professional snow ski instructor does not start teaching at Hangman's Hollow in Mammoth Mountain, one of the steepest and narrowest ski runs in the United States. Incremental teaching moves in progressive steps. It involves the professional judgment of the particular instructor. When a mishap occurs, it is always possible to assert the instructor has made a mistake and should be liable for the choices made. But this is the nature of incremental teaching. The teaching cycle involves "pushing" the student to the goal of the lesson. "Learning any sport inevitably involves attempting new skills. A coach or instructor will often urge the student to go beyond what the student has already mastered; that is the nature of (inherent in) sports instruction." (*Allan v. Snow Summit, Inc.* (1996) 51 Cal.App.4th 1358, 1368-1369; see also *Lupash v. City of Seal Beach* (1999) 75 Cal.App.4th 1428, 1436-1437.) There is an established progression to the goal of proficiency. That is what happened here. The instructor did not take the student to the equivalent of Waimea Bay or Hangman's Hollow. She took minor on a low-level jump course in the country. This was progressive and incremental teaching.

A waiver and release document can always be more specific and the majority could write such a document. So could I. This is not the test on appeal. The commonsense rationale of the trial court should not be tested by a waiver theoretically drafted by Professors Williston or Corbin. (See *Paralift, Inc. v. Superior Court* (1993) 23 Cal.App.4th 748, 755; see also *National & International Brotherhood of Street Racers, Inc. v. Superior Court*

(1989) 215 Cal.App.3rd 934, 937-938.)  The fair import of the document is that it releases riding school from the theoretical negligence of the instrutor who picked the horse and who made the decision to jump in the field.  It is always possible for a plaintiff to characterize such decisions as "increasing the risk of harm."  This is at variance to the concept of incremental and progressive teaching.

The majority opinion relies heavily on Presiding Justice Kline's opinion in *Cohen v. Five Brooks Stable* (2008) 159 Cal.App.4th 1476.  There is a comprehensive and compelling dissent written by Justice Haerle.  He has adequately answered the present majority opinion's analysis.

I have deep concern for the injured minor.  But that is no reason to void the release and waiver her mother signed.  A strong case can be made that no negligence was involved here at all.  But in any event, mother agreed to assume the risks involved in the sport of horse jumping.  As the waiver and release document says:  "[h]andling and riding of a horse ALWAYS involves risk of bodily injury . . . ."

NOT TO BE PUBLISHED.


YEGAN, J.


3

Matthew P. Guasco, Judge

Superior Court County of Ventura

_____

Dykema Gossett, Becky S. James and Lisa M. Burnett for Plaintiffs and Appellants.

Hawkins Parnell & Young, Elaine K. Fresch, Jerry C. Popovich and Melanie M. Smith for Defendants and Respondents.