[No. D036826. Fourth Dist., Div. One. Apr. 2, 2001.]

COLLEEN KANE et al., Plaintiffs and Respondents, v.
NATIONAL SKI PATROL SYSTEM, INC., Defendant and Appellant.

## COUNSEL

Wilson, Elser, Moskowitz, Edelman & Dicker, Patrick M. Kelly, Steven R. Parminter, Carey B. Moorehead and Terry L. Highman for Defendant and Appellant.

Hicks & Associates and H. Thomas Hicks for Plaintiffs and Respondents

## OPINION

**BENKE, J.**—The circumstances which give rise to this appeal are tragic. Plaintiff and respondent Colleen Kane (Colleen) was severely injured and her husband, John Kane (John), was killed while they were participants in a ski clinic being conducted by defendant and appellant National Ski Patrol System, Inc. (NSPS). The clinic was for skiers who wanted to become members of a local voluntary ski patrol. Although with the benefit of hindsight one can see how errors in judgment by the clinic instructor led to Colleen's injury and John's death, the record shows that as a matter of law the Kanes assumed the risk of those errors. Accordingly we must reverse the judgment entered in favor of Colleen and her two children, plaintiffs and respondents Darren Kane and Shawn Kane, and instruct the trial court to enter a judgment in favor of NSPS.

### FACTUAL SUMMARY

Prior to the 1994-1995 ski season, John and Colleen each had approximately 30 years of experience skiing. At that point they skied regularly at the Bear Mountain ski resort in the San Bernardino Mountains. At the beginning of the 1994-1995 ski season both Kanes decided to become volunteer members of the Bear Mountain ski patrol. On weekends and holidays Bear Mountain relies primarily on volunteer members of its ski patrol.

Bear Mountain requires that near the end of a season of training prospective members of its ski patrol pass a series of tests which demonstrate their skiing skills. NSPS conducts those tests for Bear Mountain.[1]

To become a "basic patroller" under NSPS standards a skier must demonstrate that he or she is able to ski the most advanced slope at the area where he or she will patrol in a "strong competent manner" and that he or she can "proficiently" ski all the terrain at the area, under all snow and weather conditions. Ski patrol candidates must also be able to successfully tow a rescue toboggan. If a ski patrol candidate is unable to meet these criteria the candidate may continue training, elect to participate as a first aid volunteer at the bottom of the ski slope, or decide not to become a member of the ski patrol.

In the early part of the 1994-1995 ski season both of the Kanes were given an "on the hill" evaluation in which they successfully demonstrated they were sufficiently accomplished skiers to participate as candidate members of the ski patrol. After completing the on the hill evaluation the Kanes each executed two documents by which they expressly assumed the risk of injury and released Bear Mountain and it agents from liability.

For approximately 10 weekends that winter the Kanes patrolled as candidate members of the Bear Mountain voluntary ski patrol and participated in skiing skills clinics offered by NSPS. When they were skiing as candidate members of the ski patrol, they assisted experienced ski patrollers on trails on each of Bear Mountain's three slopes: Goldmine Peak, Silver Mountain and Bear Peak.

On the morning of January 14, 1995, the Kanes decided to take a skiing skills clinic offered by NSPS and led by Larry Stone, an NSPS instructor. The goal of the clinic was to permit ski patrol candidates to practice their basic skiing skills as preparation for working with loaded and unloaded rescue toboggans. In addition to the Kanes, two other ski patrol candidates participated in the clinic.

Commencing at approximately 9:00 a.m., Stone, who had skied with the Kanes previously, took the clinic first to the trails on Goldmine Mountain and then to the trails on Silver Mountain. On these trails the Kanes and the other clinic participants reviewed basic skiing maneuvers, such as edge control.

At approximately 11:00 a.m., Stone took the clinic to the Geronimo Trail on Bear Peak. Bear Peak is the highest mountain at Bear Mountain and the

---

[1]Bear Mountain also accepts the credentials of other ski patrol organizations.

Geronimo Trail is the most difficult trail at the resort. The operators of Bear Mountain gave the Geronimo Trail a rating of two black diamonds, which signifies the operators' determination that skiers need to "use extra caution" when skiing on that trail.

After leaving the ski lift at the top of Bear Peak, Stone led the clinic toward the ungroomed eastern portion of the Geronimo Trail. The eastern portion of the Geronimo Trail runs adjacent to a canyon known as Bow Canyon. Stone asked the participants if they wanted to ski to a portion of the trail, which was spotted with trees, rocks and stumps. At that point the ungroomed portion of the trail was icy. According to Colleen, all the participants in the clinic were reluctant to go through the area suggested by Stone; Stone responded to their reluctance by asking the participants what would they do "if there were a skier over the side?" Stone then successfully led the participants through the area with the obstacles. At that point Colleen turned to her husband and said "I still don't like where we [are]"; according to Colleen, her husband nodded in agreement.

Stone then skied down the steep icy slope the clinic had reached and instructed his students to follow him. Stone wanted the participants to use short radius turns and demonstrate their edge control techniques on the ungroomed portion of the trail. Colleen and one of the other participants skied down the slope to Stone. After stopping, Colleen turned, looked up the slope and saw her husband sliding down the hill, feet first, without his skis or poles. Apparently John had fallen when one of his skis lost its "edge" on the icy surface. John continued sliding down the hill and went over the edge of Geronimo Trail, into Bow Canyon and out of the sight of Stone and Colleen.

Colleen turned to Stone and told him that John went over the side. Colleen then told Stone that she thought they should go and see if John was all right. Stone did not respond to Colleen's statement and she concluded Stone was not going to take any action; she then skied on her own toward the area where her husband had gone into Bow Canyon. Colleen also fell on the slope and lost her skis and poles; she started sliding down the hill and she too went over the side of the trail and into Bow Canyon.

Stone and other rescuers were able to ski to the edge of the trail, get to the bottom of the canyon and provide first aid to the Kanes. Colleen had come to rest underneath her husband. She sustained a severely broken right leg; unfortunately, John died at the scene.

## PROCEDURAL HISTORY

Colleen and her two sons filed a wrongful death and personal injury complaint against Bear Mountain and NSPS. They alleged the resort and NSPS had acted recklessly in conducting the skiing skills clinic.

Prior to trial the Kanes reached a settlement with the operators of Bear Mountain. At trial the NSPS asserted the Kanes' claims were barred both by the doctrine of assumption of the risk and by the releases Colleen and John had signed when they became candidate members of the Bear Mountain ski patrol. The case was tried without a jury. Following the close of the Kanes' case, NSPS moved for a judgment in its favor under the provisions of Code of Civil Procedure section 631.8. The trial court denied the motion and following presentation of the defense case, the trial court found in favor of the Kanes. In particular, relying on an expert offered by the Kanes, the trial court found that given the conditions which existed, Stone had acted recklessly in asking the Kanes to ski in terrain and under conditions they were not sufficiently skilled to safely negotiate. The trial court found the releases did not protect NSPS from liability with respect to the clinics it conducted and that even if they did benefit NSPS, the releases did not cover reckless conduct.

The trial court awarded the Kanes a total of $1 million in wrongful death damages and Colleen an additional $400,000 for her personal injuries and attendant emotional distress.

NSPS filed a timely notice of appeal.

## DISCUSSION

### I

In the end the trial court's judgment depends upon the validity of its finding of recklessness. The trial court's recklessness finding is critical here because our Supreme Court has found that participants in energetic sports activities assume the risk inherent in such activities and may not hold other participants liable for injuries they may suffer as a result of a coparticipant's simple carelessness. (*Knight v. Jewett* (1992) 3 Cal.4th 296, 318-319 [11 Cal.Rptr.2d 2, 834 P.2d 696].) Even accepting the trial court's finding that clinic instruction was not covered by the releases the Kanes signed, in the absence of recklessness or other conduct which increased the inherent risk involved in the clinic, the Kanes' claims against NSPS are barred by the doctrine of assumption of the risk. (See *id.* at pp. 318-320; *Lupash v. City of*

*Seal Beach* (1999) 75 Cal.App.4th 1428, 1440 [89 Cal.Rptr.2d 920]; *Aaris v. Las Virgenes Unified School Dist.* (1998) 64 Cal.App.4th 1112, 1119-1120 [75 Cal.Rptr.2d 801]; *Allan v. Snow Summit, Inc.* (1996) 51 Cal.App.4th 1358, 1369 [59 Cal.Rptr.2d 813]; *Bushnell v. Japanese-American Religious & Cultural Center* (1996) 43 Cal.App.4th 525, 532 [50 Cal.Rptr.2d 671].) Thus we must first consider the trial court's finding Stone acted recklessly.

■ Our review of the trial court's recklessness finding is strictly limited: "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, ·contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.* [Citations.]" (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874 [197 Cal.Rptr. 925]; see also *People v. Johnson* (1980) 26 Cal.3d 557, 576-577 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

## II

■ "The courts have concluded that vigorous participation in . . . sporting events likely would be chilled if legal liability were to be imposed on a participant on the basis of his or her ordinary careless conduct. The cases have recognized that, in such a sport, even when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself, imposition of *legal liability* for such conduct might well alter fundamentally the nature of the sport by deterring participants from vigorously engaging in activity that falls close to, but on the permissible side of, a prescribed rule." (*Knight v. Jewett, supra,* 3 Cal.4th at pp. 318-319.) Liability may be imposed on another participant in a sporting activity only when the participant intentionally injured another player or engaged in conduct which was so *"reckless as to be totally outside the range of the ordinary activity involved in the sport."* (*Id.* at p. 320, italics added.)

In *Knight v. Jewett,* the plaintiff was injured in touch football game when the defendant stepped on her hand and severely injured her little finger. Because of continuing pain and the plaintiff's failure to ever fully recover movement, the finger was amputated. In resisting the defendant's motion for summary judgment, the plaintiff submitted her own declaration and the

declaration of another participant in which they stated that only moments before injuring plaintiff defendant had been asked "not to play so rough," that he ran into the plaintiff from behind, knocked her down, stepped on her hand and continued running until he had tagged and knocked down the ball carrier. In rejecting the plaintiff's contention that these declarations were sufficient to establish recklessness, the court in *Knight* stated "the conduct alleged in those declarations is not even closely comparable to the kind of conduct—conduct so reckless as to be totally outside the range of the ordinary activity involved in the sport—that is a prerequisite to the imposition of legal liability upon a participant in such a sport." (*Knight v. Jewett, supra*, 3 Cal.App.4th at pp. 320-321.)

In the course of its discussion of the doctrine of assumption of risk, the court in *Knight v. Jewett* was careful to point out that in any sporting activity there are risks which participants *do not* assume. "Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport. Thus, although a ski resort has no duty to remove moguls from a ski run, it clearly does have duty to use due care to maintain its towropes in a safe, working condition so as not to expose skiers to an increased risk of harm. The cases establish that the latter type of risk, posed by a ski resort's negligence, clearly is not a risk (inherent in the sport) that is assumed by a participant." (*Knight v. Jewett, supra*, 3 Cal.4th at pp. 315-316.)

The reasoning set forth in *Knight v. Jewett* has been repeatedly used to shield sports instructors and coaches from liability. (See *Lupash v. City of Seal Beach, supra*, 75 Cal.App.4th at p. 1440 [no recklessness and hence no liability for instructor who encouraged emotionally upset swimmer to participate in relay race in which swimmer was rendered quadriplegic]; *Aaris v. Las Virgenes Unified School Dist., supra*, 64 Cal.App.4th at pp. 1119-1120 [same result for coach who encouraged cheerleaders to attempt difficult and hazardous maneuver]; *Allan v. Snow Summit, Inc., supra*, 51 Cal.App.4th at p. 1369 [same result for ski instructor who encouraged novice skier to leave beginner's slope and try top of the mountain where novice suffered herniated discs]; *Bushnell v. Japanese-American Religious & Cultural Center, supra*, 43 Cal.App.4th at p. 532 [same result for martial arts instructor who increased speed of maneuver causing student's broken leg].) The rationale that immunized these instructors from liability was initially and most fully articulated in *Bushnell v. Japanese-American Religious & Cultural Center*: "The question, as always, is whether the imposition of liability would chill vigorous participation in the activity. To instruct is to challenge, and the

very nature of challenge is that it will not always be met. It is not unreasonable to require a plaintiff who has chosen to be instructed in a particular activity to bear the risk that he or she will not be able to meet the challenges posed by the instructor, at least in the absence of intentional misconduct or recklessness on the part of the instructor. Any other rule would discourage instructors from asking their students to do anything more than they have done in the past, would therefore have a chilling effect on instruction, and thus would have a negative impact on the very purpose for seeking instruction: mastering the activity." (*Bushnell*, at p. 534.)

The cases that have found sports instructors and coaches liable for injury to their students have done so where the record demonstrated that the defendant instructors had increased the risk over and above those inherent in the sport. (See, e.g., *Wattenbarger v. Cincinnati Reds, Inc.* (1994) 28 Cal.App.4th 746, 750 [33 Cal.Rptr.2d 732] [no assumption of the risk where 17-year-old pitcher allowed to continue pitching during tryout after he reported hearing "pop" in his arm and feeling pain]; *Tan v. Goddard* (1993) 13 Cal.App.4th 1528, 1535-1536 [17 Cal.Rptr.2d 89] [no assumption of risk where student jockey told to ride lame horse in the wrong direction on a particularly rocky track]; *Galardi v. Seahorse Riding Club* (1993) 16 Cal.App.4th 817, 823-824 [20 Cal.Rptr.2d 270] [competitive equestrian did not assume risk of injury caused when instructor placed fences at unsafe heights and intervals and told student to ride course in reverse direction].)

The cases holding instructors liable are consistent with *Knight v. Jewett* in that in those cases the instructors' conduct was analogous to the example of the defective rope tow discussed in *Knight v. Jewett, supra*, 3 Cal.App.4th at page 316. (See *Tan v. Goddard, supra*, 13 Cal.App.4th at pp. 1535-1536.) As the court in *Bushnell v. Japanese-American Religious & Cultural Center, supra*, 43 Cal.App.4th at page 533 explained in discussing the holding in *Tan v. Goddard*: "Failing to provide a fit animal and a safe track increased the risk to the plaintiff beyond that inherent in the activity and liability might attach for requiring the plaintiff to take on the increased risk. To look at the situation another way, requiring the defendant to provide a safe horse and track could have no chilling effect on the activity itself, nor would it interfere with the ability of the instructor to teach the student new or better skills."

### III

In light of the foregoing principles, the trial court's finding of recklessness cannot be sustained. In concluding Stone had acted recklessly, the trial court relied exclusively on the testimony of the Kanes' skiing

expert, who found that in 12 respects Stone had acted improperly.[2] The principal difficulty with the expert's criticisms of Stone's conduct is that each of them is no more than a criticism of Stone's assessment of the difficulty of the terrain, the relative skill of the Kanes and the hazard created by Bow Canyon. In hindsight it is of course easy to accept each of the expert's criticisms. Plainly, Stone did not properly assess the ability and stamina of the Kanes or the fatal hazard posed by Bow Canyon.

In a case where only negligence must be shown, Stone's faulty assessment of the overall situation opinion would suffice. Here however it will not. (*Lupash v. City of Seal Beach, supra,* 75 Cal.App.4th at p. 1440; *Aaris v. Las*

---

[2]As summarized by the trial court, the expert found: "One; the instructor failed to provide a safe environment for the class.

"Two, the instructor used the 'follow me' technique, which should not be used in difficult terrain; rather, the 'call down' method should have been used.

"Three, the 'follow me' method should not be used when students need to make decisions on their own.

"Four, candidates should not use short radius turns to get to a hypothetically injured person in this area.

"Five, a student should never be asked to go in an area uncomfortable to them when new training is involved. The new training should be on familiar territory until the students are comfortable, and then attempted on new territory.

"Six, the instructor failed to realize that the frustration of difficult terrain interferes with learning, and that frustrated students in difficult terrain often cannot perform to their own previously demonstrated level of ability.

"Seven, what Instructor Stone did was not in harmony with snow conditions, terrain, the capability or desires of his students.

"Eight, one should never ski a run of questionable safety.

"Nine, the student should have rested and 'recharged,' and the group should ski at the level of the most exhausted skier, that is to say, the weakest link.

"Ten, the instructor should insist on a lot of rest for students, and stay in touch with their feelings, and in this case, should have suggested that maybe they would try it another day.

"Eleven, all of this should be viewed in light of the fact that it's agreed that student will relegate some personal responsibility to a ski instructor due to his or her skiing experience, and the instructor must be aware of this and be very careful to have knowledge of the run and of the students' skill levels, because students do defer to instructors in a way not applicable in unsupervised free skiing.

"Twelve, this was the wrong exercise at their stage of training. While there was a dispute as to the level at which they skied, the Court finds, from the evidence and the various people's opinions, that they were average skiers, not expert or advanced experts, as contended by the defense. And while it's a matter of credibility, the Court finds in favor of the plaintiff on that issue.

"Mr. Penniman's expert opinion, based on these 12 reasons, was that Mr. Stone, the instructor, should have assessed the situation, recognized the dangers, evaluated the attitude, skills, conditioning and exhaustion of his students, then used the ski down method and reassessed the mountain. When they resisted his invitation, he should have realized that they were tired and not recharged, and that the ski line he proposed could result in a simple fall with an uncontrollable slide into an area where there are hazards that will inevitably be hit, and that taking them in an area where an uncontrollable slide will take you off a cliff is irresponsible and is definitely reckless."

*Virgenes Unified School Dist., supra,* 64 Cal.App.4th at pp. 1119-1120; *Allan v. Snow Summit, Inc., supra,* 51 Cal.App.4th at p. 1369; *Bushnell v. Japanese-American Religious & Cultural Center, supra,* 43 Cal.App.4th at p. 532.) Falling and thereby being injured or even killed are inherent dangers of skiing. (See *Allan v. Snow Summit, Inc., supra,* 51 Cal.App.4th at p. 1367.) Were operators of ski resorts required to entirely eliminate the danger of falling in difficult terrain, "the prospect of liability would effectively terminate the business of ski resort operation." (*Ibid.*) Those risks are, needless to say, also inherent in attempting to improve one's skiing skills to such a level that one can take responsibility for other injured skiers. Thus, as we have noted, the Kanes were required to show that Stone's conduct took them beyond the risks inherent in attempting to improve their own skiing skills. (See *Knight v. Jewett, supra,* 3 Cal.4th at pp. 320-321.)

In this factual context, an instructor's assessment errors—either in making the necessarily subjective judgment of skill level or the equally subjective judgment about the difficulty of conditions—are in no way "outside the range of the ordinary activity involved in the sport." (*Knight v. Jewett, supra,* 3 Cal.4th at p. 321.) Instructors must of necessity make such judgments in order to sufficiently challenge skiers so that they will in fact improve their skills. (See *Bushnell v. Japanese-American Religious & Cultural Center, supra,* 43 Cal.App.4th at p. 534.) Moreover, the consequence of holding a ski patrol instructor liable for such errors would be calamitous. If a ski patrol instructor's assessment of skill and conditions will support liability, we are at a loss as to what organization or person would or could take on the responsibility of training skiers to rescue other skiers. Because the ability to second-guess an instructor's assessment is essentially limitless, so too would an instructor's liability be limitless. The likely absence of a competent ski patrol would in turn endanger every skier.

Because the facts presented by the Kanes did not show recklessness or other conduct outside the inherent risk of training to be a ski patrol member, the trial court should have granted NSPS's motion for judgment.

Judgment reversed with instructions to enter judgment in favor of NSPS. Costs are awarded to appellant.

Kremer, P. J., and Huffman, J., concurred.

Respondents' petition for review by the Supreme Court was denied June 20, 2001. Kennard, J., was of the opinion that the petition should be granted.