[No. C057565. Third Dist. Aug. 26, 2009.]

ELLYN LEVINSON et al., Plaintiffs and Appellants, v.
BERT OWENS et al., Defendants and Respondents.

1536

## COUNSEL

Hersh & Hersh, Nancy Hersh; Law Office of Daniel U. Smith and Daniel U. Smith for Plaintiffs and Appellants.

Hayes Davis Bonino Ellingson McLay & Scott, Mark G. Bonino, Miya R. Peard; Maire & Beasley, Wayne H. Maire and Patrick L. Deedon for Defendants and Respondents.

## OPINION

**SCOTLAND, P. J.**—"The thrill of victory, the agony of defeat" are emotions usually associated with sports, but often follow the culmination of a lawsuit. In this case, they arose from both.

The victors in a lawsuit gathered at the cattle ranch of a prevailing party to celebrate with a barbeque. The attorney who secured the legal victory asked the hosts to allow her to ride one of their horses. After assuring them that she had ridden horses before, she saddled up on Pistol, a quarter horse trained as a cattle horse. Unable to control the horse when it later began to gallop, the attorney fell off and was injured. No novice in court, she sued her social hosts for damages. The trial court held that primary assumption of the risk defeated her claims because a person who engages in the inherently dangerous activity of horseback riding generally assumes the risk of being injured by the horse or by the careless conduct of others involved in the activity. (*Knight v. Jewett* (1992) 3 Cal.4th 296, 316 [11 Cal.Rptr.2d 2, 834 P.2d 696]; e.g., *Harrold v. Rolling J Ranch* (1993) 19 Cal.App.4th 578, 585–588 [23 Cal.Rptr.2d 671].)

On appeal, she concedes the doctrine of primary assumption of the risk applies to horseback riding but contends that triable issues of material fact exist as to whether the social hosts, the owners of Pistol, breached a duty to not recklessly "increase the inherent risks of riding by: (1) placing [her] on Pistol, [a horse specially trained for sorting cattle on the ranch and for reining and team penning events at amateur competitions,] thus creating a mismatch between [her] inability to control a horse and Pistol's highly-trained abrupt behaviors; (2) failing to ask [about] her skill level in riding and controlling horses; (3) failing to warn [her] of Pistol's trained behaviors of starting,

stopping and turning abruptly; (4) telling [her] not to control Pistol by pulling on the reins; and (5) giving [her] no instruction on how to control Pistol."

We shall affirm the summary judgment entered in favor of the owners of Pistol. As we will explain, they were not commercial operators whose services and horses were for hire for a leisurely, supervised trail ride; indeed, they were not organizers or sponsors of any horseback riding event. As hosts of a social gathering at their cattle ranch, they simply granted a guest's request to take one of their horses for an unsupervised ride in a large field after she assured them that she had previously ridden horses. Pistol, trained to engage in abrupt movements when working cattle or performing in a rodeo, was precisely the type of horse that the guest would expect to ride in an open field at the cattle ranch. Thus, Pistol was not "unduly dangerous" for that purpose. And undisputed evidence showed that, when ridden as a pleasure horse, Pistol was a gentle horse who had "never [before] run off or hurt anyone." No evidence was submitted which would support an inference other than that Pistol was simply "a 'horse behaving as a horse' " (*Harrold v. Rolling J Ranch, supra*, 19 Cal.App.4th at pp. 581, 587, 588) when he uncharacteristically galloped off and the rider was injured when she did not control him. Although, in hindsight, it became evident the injured rider lacked the skills to control a horse in that setting, the owners of Pistol were entitled to accept the rider's representation that she had experience riding horses, thus indicating she knew how to control horses. To impose a duty on the social host to second-guess the guest's assertion and to cross-examine her about the extent of her experience would alter and chill the sport of horseback riding in the ultimate way—by precluding social guests from engaging in the sport. This is so because, if such an inquiry were necessary to avoid potential liability, few, if any, social hosts would consent to a guest's request to ride one of the host's horses. There being no evidence that Pistol's training as a cattle horse posed an increased risk to a rider not engaged in cattle herding or rodeo riding, the hosts had no duty to warn the rider about Pistol's skills as a cattle horse. Telling the rider not to pull back on the reins while a host was adjusting Pistol's stirrups is not susceptible to an interpretation by any person who has ridden a horse, including those with minimal experience, as a direction to never pull on the reins to control Pistol, even if he began to run away with her; thus, the admonition did not recklessly increase the risk of harm beyond that inherent in horseback riding. And, given the rider's professed experience in horseback riding, the hosts had no duty to give her instructions on how to control Pistol.

Simply stated, when the social guest asked her social hosts to allow her to ride one of their horses on their cattle ranch, and she professed to have the experience to do so, she "bit off more than she could chew" and has only herself to blame for her inability to control a horse that behaved as a horse when it uncharacteristically galloped off.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Incident*

In May 2005, defendants Bert and Anne Owens hosted a barbeque at their cattle ranch in celebration of a recent victory in which plaintiff Ellyn Levinson, an attorney representing California's Department of Conservation, successfully moved for summary judgment against Tehama County, convincing the superior court to enjoin the county from approving a lot line adjustment until it had complied with the Williamson Act (Gov. Code, § 51200 et seq.). (For simplicity and to avoid confusion, we will henceforth refer to Bert and Anne Owens by their first names.) Bert was one of the landowners involved in the litigation. Pleased with the outcome, he invited Levinson, and others who had an interest in the litigation, to come to the ranch for a barbeque. Levinson brought her daughter, Rachel.

Prior to the barbeque, Levinson inquired whether she and Rachel would be able to do some horseback riding while at the ranch. Anne asked if Levinson had ridden horses before; Levinson said that she had. Impressed with Levinson's confident demeanor and competence during the litigation, Anne did not further question Levinson's riding ability. Anne explained: "I took her [statement] that she's ridden [to mean that] she's ridden."

Before the barbeque was served, guests who expressed interest in horseback riding (including Levinson, Rachel, and Susan Oliva, the wife of a Department of Conservation lawyer) walked to the barn.

A horse named Tango was already saddled, having been worked earlier in the day. Oliva was selected to ride Tango because she wanted a horse that was "really tired" and would do nothing more than walk around. Pistol, a quarter horse trained as a cattle horse, was saddled by Rachel and Bert for Rachel to ride. When Rachel changed her mind and decided not to ride, Levinson volunteered, "I'll get on the horse," and mounted Pistol. Because Levinson and Oliva earlier said that they had ridden horses before, Bert did not ask again whether they had horseback riding experience.

As Bert was adjusting the stirrups for her feet, Levinson pulled back on the reins, causing Pistol to rear his head up and begin to move around. Bert responded: "Don't pull back on the reins; the horse is sensitive."[1] At this point, one of the guests at the barbeque asked Levinson if she had ridden a horse before; Levinson told the woman she rode a horse "at the park." Aside

---

[1] As Bert described it, when Levinson suddenly pulled back on the reins, he simply told her, "Ellyn, don't jerk the horse."

from the rearing motion when Levinson pulled back on the reins, Pistol did nothing to make Levinson feel uncomfortable about being on the horse. Bert then led Levinson and Pistol into a small corral where Oliva and Tango were already waiting; the women walked their horses around the small corral for several minutes before Bert opened the gate separating the small corral from a large field, which was also described as a pasture or big corral. Neither Levinson nor Oliva had any problems riding the horses in the small corral.

When Levinson and Pistol entered the larger field, Pistol unexpectedly began to trot and then broke into a gallop. As Pistol galloped back to the small corral, Levinson's feet came out of the stirrups. Rather than pull back on the reins to try to slow Pistol down, she let go of the reins and held onto the saddle horn in an attempt to stay on the horse. When Pistol reached the corner of the small corral, he abruptly cut to the left, throwing Levinson from his back. Levinson's body slammed into a fence and ended up in a feed bunk. Her hip was shattered and her face was cut by barbed wire at the top of the fence.

No one at the barbeque had any idea what possessed Pistol to bolt from the larger field into the small corral with such tragic consequences.

*Pistol's Disposition and Training As a Cattle Horse*

Bert and Anne described Pistol as a gentle and well-behaved horse. Nothing in the record contradicts this description. Pistol was comfortable around people at the barbeque and calmly allowed himself to be surrounded by guests who wanted to pet him. Before galloping away with Levinson, Pistol gave no indication that riding him would present a problem. And, prior to this incident, Pistol had "never run off or hurt anyone" while he was being ridden.

Pistol is "finely trained" for sorting cattle on the ranch and for reining and team penning events at amateur competitions.

For working cattle on the ranch, Pistol is "trained to respond to the rider's directives and separate out one particular cow from the herd. When the rider places Pistol's head in the direction of the specific cow that is to be separated, the horse understands and takes the appropriate action to accomplish this." With guidance from the rider, Pistol applies pressure to the cow, moving closer to the cow in order to coerce it into moving in the direction the rider wants the cow to go—usually through a gate. A trained cattle horse must be able to quickly turn on his hind legs in order to outmaneuver the cow.

For amateur rodeo competition, Pistol is trained to "spin" and do a "sliding stop." A horse spins by planting its hind legs and making multiple turns in the

same direction. This is accomplished by leg cues from the rider; a spin to the left requires the rider to nudge Pistol with her right calf and foot and gradually pull the rein to the left. A sliding stop involves the horse taking off at a fast gallop, approximately 20 miles per hour, and then sliding to a stop. In order to cue Pistol to take off at a fast gallop, the rider can "raise the reins slightly, make a clicking sound, or touch [Pistol] slightly [on his side] with [the rider's] boots."

### The Complaint

Levinson and her daughter Rachel (plaintiffs) sued Bert and Anne (defendants) for negligence and negligent infliction of emotional distress, alleging that, among other things, defendants "had a duty not to increase the inherent risk of horseback riding" and "breached this duty and increased the risk inherent in horseback riding by selecting a horse that, by its very nature, training and disposition, was inappropriate, unsafe and unduly dangerous for a beginner rider such as [Levinson], to wit: the horse Pistol" and by "instructing [Levinson] never to pull back on the horse's reins." Plaintiffs further alleged defendants' negligence caused Levinson to experience physical injury, pain and suffering, and loss of earnings, and caused Rachel to suffer severe emotional distress as a result of having witnessed the accident and injury to her mother.

### The Summary Judgment Motion

Defendants moved for summary judgment based on the doctrine of primary assumption of the risk, arguing that they owed no duty of care because Levinson's "decision to ride [Pistol] carried with it an assumed risk that she could fall" and defendants "did nothing to increase this inherent risk of horseback riding." Plaintiffs opposed the motion, arguing that "being catapulted from a horse bolting at a dead-run, that suddenly cuts abruptly left, ejecting the rider into a fence, is [not] an inherent risk of horseback riding," and that defendants recklessly increased the risks of horseback riding by (1) placing Levinson, an inexperienced rider, on a highly trained cattle horse; (2) failing to warn her that Pistol was "trained to, at the slightest squeeze, take off at a gallop" and "quickly stop from a dead run of about 20 to 25 [miles per hour], and that he could sit on his haunches and spin and turn"; (3) failing to ascertain that Levinson was an inexperienced rider whose only horseback riding involved trail horses; (4) not providing her with instructions on how to ride Pistol; (5) telling Levinson not to pull back on Pistol's reins; (6) not watching Levinson while she rode Pistol; and (7) generally failing to provide a reasonably safe horseback riding event.

In support of their opposition to defendants' summary judgment motion, plaintiffs submitted the declaration of Rod Bergen, an expert in the riding and

handling of horses. Bergen opined that defendants "recklessly increased the risks inherent in horseback riding" by (1) placing Levinson on "a horse that was unsafe and inappropriate for her skill level," with full knowledge that Pistol "required an experienced rider" due to Pistol's training as a cattle horse; (2) not inquiring as to the nature and extent of Levinson's riding experience; (3) failing to inform her of Pistol's ability to move very quickly; (4) not providing Levinson with instructions on how to ride Pistol; (5) failing to carefully watch Levinson once she and Pistol reached the larger field; and (6) instructing Levinson not to pull back on Pistol's reins. In Bergen's words: "A horse that suddenly, on it[]s own, with no warning, bolts, takes off at a gallop, goes full-speed at a 'dead run' towards a fence, and then abruptly spins to the left and throws a rider into the fence and nearby water/feed trough, does not represent a risk reasonably associated with activities inherent in normal horseback riding. These are not the dangers to be expected when simply riding a horse on a trail ride or when pleasure riding a horse for an afternoon's enjoyment."

### The Trial Court's Ruling

Granting the motion for summary judgment, the trial court explained: "The Defendants are ranchers. Their purpose that day was to accommodate their lawyer who wanted to ride a horse. The Court does not find that just because the horse was used to separate cows on the ranch, or that the horse was used in competition, somehow increased the Plaintiff's risk. . . . [¶] The evidence shows that the Defendants were not coaches, instructors, or in the business of renting out horses. There is no evidence of propensity for this horse to bolt for no apparent reason. There is no evidence that the horse was spooked, or that the Plaintiff inadvertently gave the horse a command which resulted in the horse bolting, stopping and spinning. The only explanation given was that the horse was just being a horse. [¶] The question in this case is whether public policy requires that a duty be imposed on a rancher who allows a guest, at [the guest's] request, to ride [the rancher's] horse at a picnic on the ranch. . . . [¶] In this case, the Plaintiff disclosed that she had ridden a horse before. She got on the horse by herself, she looked in control, and there was nothing to suggest that she did not know what she was doing. The Court finds that to impose a duty under these circumstances would not be in the interest of public policy, and it would have a chilling effect on all ranchers throughout the state. Lastly, the Court finds that the Defendants did nothing to increase the Plaintiff's risk." Judgment was entered in defendants' favor.

### Standard of Review

■ On appeal from the entry of summary judgment, "[w]e review the record and the determination of the trial court de novo." (*Kahn v. East Side*

*Union High School Dist.* (2003) 31 Cal.4th 990, 1003 [4 Cal.Rptr.3d 103, 75 P.3d 30].) "The application of the affirmative defense of primary assumption of risk requires a legal conclusion that 'by virtue of the nature of the activity and the parties' relationship to the activity, the defendant owes no legal duty to protect the plaintiff from the particular risk of harm that caused the injury.' [Citation.]" (*Shannon v. Rhodes* (2001) 92 Cal.App.4th 792, 795–796 [112 Cal.Rptr.2d 217].) In determining whether there exist any triable issues of material fact, we strictly construe the evidence proffered by the moving party and liberally construe that proffered by the opposing party. (*Giardino v. Brown* (2002) 98 Cal.App.4th 820, 829–830 [120 Cal.Rptr.2d 77].)

## DISCUSSION

### I

■ The risk of injury is inherent in certain sporting activities. (*Kahn v. East Side Union High School Dist., supra,* 31 Cal.4th at p. 1003 (hereafter *Kahn*).) Indeed, the challenges of a sport that pose a risk of injury "often are an integral part of the sport itself." (*Knight v. Jewett, supra,* 3 Cal.4th at p. 315 [e.g., "although moguls on a ski run pose a risk of harm to skiers that might not exist were these configurations removed, the challenge and risks posed by the moguls are part of the sport of skiing . . ."] (hereafter *Knight*).)

Accordingly, those who participate in such a sporting activity generally assume the risk that they may be injured while doing so. And others having a role in the activity "generally have no legal duty to eliminate (or protect a [participant] against) risks inherent in the sport itself," such as the "careless conduct of others" who are participating in the sport. (*Knight, supra,* 3 Cal.4th at pp. 315–316.) However, they "generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport." (*Ibid.* [articulating principles of primary assumption of the risk].)

These principles of the doctrine of primary assumption of the risk exist because, "as a matter of policy, it would not be appropriate to recognize a duty of care when to do so would require that an integral part of the sport be abandoned, or would discourage vigorous participation in sporting events." (*Kahn, supra,* 31 Cal.4th at p. 1004.)

Therefore, a ski resort has no duty to eliminate moguls, despite the risk of harm they pose to skiers. (*Knight, supra,* 3 Cal.4th at p. 315.) And the "careless conduct" of, and mistakes made by, other participants in a sport, such as a poorly thrown baseball that hits a runner or a brushback pitch that hits a batter, are part of the sport itself and cannot be eliminated without

altering the sport or chilling vigorous competition. (*Kahn, supra,* 31 Cal.4th at p. 1003; *Knight, supra,* 3 Cal.4th at p. 318.) Indeed, "even when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself, imposition of *legal liability* for such conduct might well alter fundamentally the nature of the sport by deterring participants from vigorously engaging in activity that falls close to, but on the permissible side of, a prescribed rule." (*Knight, supra,* 3 Cal.4th at pp. 318–319, original italics.)

■ On the other hand, for example, while a ski resort has no duty to remove moguls from a ski run, it "does have a duty to use due care to maintain its [ski lifts] in a safe, working condition so as not to expose skiers to an increased risk of harm" beyond that inherent in the sport (*Knight, supra,* 3 Cal.4th at p. 316); and, while a person participating in a sport does not owe a duty to other participants to protect them against the person's careless conduct during the activity, the person does have a duty to not "intentionally" injure another participant or not "engage[] in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Knight, supra,* 3 Cal.4th at p. 320.)

Whether a person has a duty to protect the participant in a sport from "a particular risk of harm" turns on "the nature of the activity or sport" and the "relationship of the [person] and the [participant] to that activity or sport." (*Knight, supra,* 3 Cal.4th at p. 309.) "Duties with respect to the same risk may vary according to the *role* played by particular [persons] involved in the sport." (*Kahn, supra,* 31 Cal.4th at p. 1004, original italics.)

Thus, to use another example, whether a diving instructor increases the risk of harm beyond that inherent in diving depends on the nature of the diving at issue (e.g., diving from the pool deck, compared to diving from a 10-meter platform, 33 feet above the water); the nature of the student (e.g., a fearful novice, compared to a confident, experienced diver); and the nature of the instructor's conduct. (*Kahn, supra,* 31 Cal.4th at pp. 1012–1013.)

When a sport instructor urges a student, experienced or not, "to strive to excel or to reach a new level of competence," the instructor does not recklessly increase the risk of harm inherent in a dangerous sport. (*Kahn, supra,* 31 Cal.4th at p. 1006.) This is so because learning and practicing such a sport pose risks of harm. (*Ibid.*) "[I]nstruction in a sport frequently entails challenging or 'pushing' a student to attempt new or more difficult feats . . . ," and " 'liability should not be imposed simply because an instructor asked the student to take action beyond what, with hindsight, is found to have been the student's abilities.' [Citation.]" (*Ibid.*)

Even "an instructor's assessment errors—either in making the necessarily subjective judgment of [the student's] skill level or the equally subjective judgment about the difficulty of conditions—are in no way 'outside the range of ordinary activity involved in the sport.' [Citation.] Instructors must of necessity make such judgments in order to sufficiently challenge [students] so that they will in fact improve their skills." (*Kane v. National Ski Patrol System, Inc.* (2001) 88 Cal.App.4th 204, 214 [105 Cal.Rptr.2d 600] (hereafter *Kane*).) Few persons or organizations would take on the responsibility of teaching sports if they were subject to liability for misassessments of students' skills or misassessments of the conditions of the sporting activities. (*Ibid.*) This consequence would "alter the nature of an active sport" (*Kahn, supra,* 31 Cal.4th at p. 1011) and make it more dangerous by restricting the ability of participants to improve their skills and learn how to deal with inherent dangers of the sport (see *Kane, supra,* 88 Cal.App.4th at p. 214). Thus, an instructor does not owe a duty to protect a student athlete from the risk of injury caused by the instructor's negligent overestimation of the student's abilities.

However, if a sport instructor is aware of a student's fear of, and inexperience relating to, an aspect of the sport that poses a risk of serious injury, and the instructor nonetheless demands that the student do it, without providing instruction or supervision, a "trier of fact properly could determine that such conduct was reckless in that it was totally outside the range of the ordinary activity involved in teaching or coaching the sport . . . ." (*Kahn, supra,* 31 Cal.4th at p. 1013.)

II

■ Horseback riding is a dangerous sporting activity; "being thrown off a horse [i]s an inherent risk of horseback riding, [indeed] . . . it is one of the most obvious risks of that activity, and readily apparent to anyone about to climb on a horse." (*Guido v. Koopman* (1991) 1 Cal.App.4th 837, 842 [2 Cal.Rptr.2d 437].)

Applying the aforesaid principles of primary assumption of the risk to horseback riding leads to the following general conclusions: The rider generally assumes the risk of injury inherent in the sport. Another person does not owe a duty to protect the rider from injury by discouraging the rider's vigorous participation in the sport or by requiring that an integral part of horseback riding be abandoned. And the person has no duty to protect the rider from the careless conduct of others participating in the sport. The person owes the horseback rider only two duties: (1) to not "intentionally" injure the rider; and (2) to not "increase the risk of harm beyond what is inherent in [horseback riding]" (*Kahn, supra,* 31 Cal.4th at p. 1004) by "engag[ing] in

conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport" (*Knight, supra,* 3 Cal.4th at p. 320). With respect to increasing the risk of harm, the duty "may vary according to the *role* played by particular [persons] involved in the sport" (*Kahn, supra,* 31 Cal.4th at p. 1004, original italics) and the nature of the particular riding activity at issue (*ibid.;* see *Harrold v. Rolling J Ranch, supra,* 19 Cal.App.4th at pp. 585–588 (hereafter *Rolling J Ranch*)).

For example, the commercial operator of a trail riding business geared toward riders with little experience has a duty "to ensure the facilities and related services which are provided do not increase the risk of injury above the level inherent in [such a trail ride]." (*Rolling J Ranch, supra,* 19 Cal.App.4th at p. 586, italics omitted.) This does not mean that the operator has a duty to "provide 'ideal' riding horses such that they never buck, bite, break into a trot, stumble or 'spook' when confronted by a frightening event on the trail such as a shadow or snake or react to peculiar movements of a rider"; such "sudden movements of a horse" are inherent in the riding of horses, even in the supervised setting of a casual trail ride. (*Id.* at p. 588.) Thus, there is no duty to protect riders from the risk of injury inherent in a " 'horse behaving as a horse' " (*ibid.*); however, the commercial trail ride operator does have "a duty to supply horses which are not unduly dangerous" for such a ride and to "warn the patrons renting a given horse if that horse has evidenced a predisposition to behave in ways which add to the ordinary risk of horse riding" (*id.* at p. 587).

## III

In this case, defendants were not a commercial enterprise that rents horses for riding. They were not, and did not purport to be, horseback riding coaches or instructors. They were not riding horses with Levinson when she was injured. And they were not organizers or sponsors of a horseback riding event, i.e., they did not invite anyone to their ranch for the purpose of horseback riding. (Cf. *Luna v. Vela* (2008) 169 Cal.App.4th 102 [86 Cal.Rptr.3d 588] [alleged tortfeasor organized a volleyball game on a make-shift court in his front yard and invited the 13-year-old plaintiff to play].) Having invited social guests to join them for a barbeque at their ranch, they simply granted the request of a guest, Levinson, to ride one of the hosts' horses during the gathering.

Because defendants provided the means (Pistol) by which Levinson engaged in the inherently dangerous sport of horseback riding, the principles of primary assumption of the risk apply. (See *Rolling J Ranch, supra,* 19 Cal.App.4th at pp. 585–588; *Guido v. Koopman, supra,* 1 Cal.App.4th at p. 842.) As we will explain, defendants' relationship with Levinson (as her

social hosts who did not organize a horseback riding event, who were not commercial operators whose services and horses were for hire by Levinson, and who simply granted Levinson's request to ride one of their horses while she was at a gathering of friends for a barbeque) and the nature of the sporting activity requested by Levinson (an unsupervised ride on a horse used on a cattle ranch, not a supervised trail ride on a horse provided by a commercial entity) are relevant to the questions of the extent of defendants' duty to Levinson and whether a triable issue of material fact exists such that defendants could be found to have recklessly increased the risks of harm inherent in horseback riding.

## A

Plaintiffs contend that a triable issue of fact is presented as to whether "Pistol was 'not appropriate for use' by Levinson" and "posed excessive risks to [her]." In support of this contention, they rely on the decisions in *Rolling J Ranch, supra,* 19 Cal.App.4th 578, *Cohen v. Five Brooks Stable* (2008) 159 Cal.App.4th 1476 [72 Cal.Rptr.3d 471] (hereafter *Cohen*), *Giardino v. Brown, supra,* 98 Cal.App.4th 820 (hereafter *Giardino*), *Galardi v. Seahorse Riding Club* (1993) 16 Cal.App.4th 817 [20 Cal.Rptr.2d 270] (hereafter *Galardi*), and *Tan v. Goddard* (1993) 13 Cal.App.4th 1528 [17 Cal.Rptr.2d 89] (hereafter *Tan*).

*Rolling J Ranch* held that "a riding stable offering short term trail rides to casual riders owes a duty to those to whom it rents horses . . ." to "supply horses which are not unduly dangerous." (*Rolling J Ranch, supra,* 19 Cal.App.4th at pp. 581, 587.) "[U]nduly dangerous," the court explained, means a horse with "a dangerous propensity" beyond that inherent in a " 'horse behaving as a horse' " (*id.* at pp. 587, 581, 588); as examples of a horse behaving as a horse, the court identified the risks that a horse may "buck, bite, break into a trot [or gallop], stumble or 'spook' when confronted by a frightening event," "any of which may throw the rider." (*Id.* at pp. 588, 587.) In that case, a woman on a commercial trail ride was thrown to the ground when the horse she was riding was "spooked" by her actions in wrapping the reins around the saddle horn and trying to remove her jacket. Previously, the horse had become "spooked and thrown a rider when that rider took off and waved a hat." (*Id.* at p. 582.) The court held that, as a matter of law, "the one prior incident of the subject horse having spooked does not rise to the level of a dangerous propensity . . ."; it simply was a horse behaving as a horse, "with no incumbent duty on the part of the stable operator." (*Id.* at p. 588.) Thus, *Rolling J Ranch* affirmed the summary judgment entered in favor of the stable operator. (*Id.* at pp. 583, 589.)

*Cohen* held that, although sudden movements of a horse are an inherent risk of even the most casual trail rides, a reasonable jury could find the trail

guide's intentional provocation of the horses to gallop, without warning the other riders, was " 'so reckless as to be totally outside the range of the ordinary activity involved' " in a ride provided by a commercial riding stable. (*Cohen, supra*, 159 Cal.App.4th at p. 1494.) Thus, *Cohen* overturned summary judgment entered in favor of a stable in an action brought by a woman who fell from a horse during a guided trail ride when the guide, "knowing the horses behind him would follow and adjust to the gait of his horse, suddenly caused his horse to gallop without warning the other riders, thereby causing [the woman's] horse also to gallop." (*Id.* at p. 1480.)

*Giardino* held that, although a commercial equestrian service "may [have] no duty to provide 'ideal' horses to a children's camp," it has a duty "[not to] provide horses inappropriate for beginning riders [at] a children's camp for novice riders." (*Giardino, supra*, 98 Cal.App.4th at p. 834.) The complaint in that case alleged that a young girl, inexperienced in riding horses, was seriously injured when she was permitted to tie a horse to a hitching post and the horse became spooked, causing the girl's fingers to be caught in the rope. (*Id.* at p. 823.) *Giardino* cited, as a triable issue of material fact, evidence submitted by the plaintiff that the horse was " 'head shy,' " a " 'condition [that] develops early in the life of a horse and persists throughout the horse's life,' " causing it to be " 'particularly sensitive to being approached and/or touched around the eyes and ears.' " (*Id.* at p. 825, italics omitted.) Because a reasonable jury could find that this condition did in fact exist and that a horse with such a condition would be unsafe for novice riders at a children's camp, *Giardino* reversed summary judgment entered in favor of the equestrian service. (*Id.* at pp. 834, 837.)

*Galardi* held that a riding club instructor, who was training an equestrian student experienced in jumping horses over fences and other barriers, had a duty to avoid an unreasonable risk of injury to the student by "tak[ing] care that the jumping array was not beyond the capability of horse and rider." (*Galardi, supra*, 16 Cal.App.4th at pp. 820, 823.) Concluding that a triable issue of material fact existed as to whether the instructor had "deployed the jumps at unsafe heights or intervals," *Galardi* reversed the summary judgment entered in favor of the riding club. (*Id.* at p. 823.)

*Tan* held that a riding instructor had a duty to the student "to see to it that the horse he assigned [to the student] was safe to ride under the conditions [the instructor] prescribed for th[e] activity." (*Tan, supra*, 13 Cal.App.4th at p. 1535.) Citing evidence that the instructor assigned a horse he knew "was 'off' due to an injury" and then told the student to jog the horse on a rocky part of the facility, the court concluded these were triable issues of material fact that required reversal of the summary judgment entered in favor of the riding school. (*Id.* at pp. 1535–1536.)

As undisputed evidence in this case shows, the circumstances here are distinguishable from those in the aforesaid cases.

First, Levinson went to a cattle ranch wanting to ride one of its horses, not to a commercial trail ride where the horses are "chosen to be solid, unflappable and easy-going" and are trained to simply "follow the horse in front of them." Those who choose to engage in trail riding "are not expected to be able to steer or cue their horses, and are expected to basically sit back and enjoy the ride"; whereas those, like Levinson, who choose to ride a horse at a working cattle ranch in a large field, must expect that the horses there are trained to work cattle. Thus, Levinson had to expect that Pistol would not be a plodder and that he could give her a more exciting ride than would a trail ride horse.

Second, as the trial court noted, there is "no evidence" that Pistol had a "propensity" to "bolt for no apparent reason." Undisputed evidence showed Pistol was gentle, comfortable around people, and calmly allowed guests at the barbeque to surround and pet him; and it was uncontested that defendants picked Pistol for Levinson because of Pistol's "gentle" disposition and allowed her to ride their "best horse" because they "so much appreciated" what she had done in the lawsuit. Plaintiffs did not dispute Bert's and Anne's testimony that, in addition to being a cattle horse, Pistol was ridden as a "pleasure horse" and that others had taken Pistol for pleasure rides without any problems, as reflected by (1) Anne's answer, "I have," when asked about "put[ting] a really novice rider on him and let them go out and ride him"; and (2) Anne's testimony that she had never seen Pistol look like he did when he galloped off with Levinson. Indeed, plaintiffs concede that, until this accident, Pistol had "never run off or hurt anyone."

Third, with respect to the accident at issue in this case, there was "no evidence that [Pistol] was spooked, or that [Levinson] inadvertently gave the horse a command which resulted in the horse bolting, stopping and spinning."

Fourth, defendants invited Levinson to their cattle ranch for the purpose of a barbeque, not for the purpose of horseback riding. Although they granted her request to ride one of their horses, they were not riding instructors and they did not direct Levinson to ride in any particular way, or in any particular place, that could increase the risk beyond that inherently involved in doing what Levinson asked to do—ride a cattle horse in the field of a cattle ranch.

The only legal conclusion to be drawn from all of this is that plaintiffs failed to present a triable issue of material fact tending to show that Pistol was an "unduly dangerous" horse, rather than a horse simply acting as a horse when he uncharacteristically galloped off and Levinson was injured.

Contrary to plaintiffs' assertion, and their expert's opinion on the subject, the mere fact that Pistol was trained as a cattle horse capable of abrupt movements when working cattle or performing in a rodeo does not present a triable issue of fact as to whether he was an "unduly dangerous" horse for the purpose of noncommercial pleasure riding on a working cattle ranch. As we have pointed out, Pistol is precisely the type of horse that a rider would expect to find and ride at the ranch, and it was undisputed that Pistol had been a "gentle horse" who had never before "run off or hurt anyone."

## B

The thrust of plaintiffs' position really is that Pistol was unduly dangerous in the circumstances of this case because Levinson was not experienced enough in horseback riding to control Pistol. This position turns on whether Levinson's lack of experience was known to, or should have been known by, Bert and Anne and whether, as social hosts who invited Levinson to their ranch for a barbeque and not for the purpose of horseback riding, they had a duty to quiz her on her horseback riding skills even after she assured them that she had ridden horses before.

In plaintiffs' view, although it was Levinson who brought up the subject of horseback riding and told her social hosts, Bert and Anne, that she had prior experience riding horses, they should have in effect cross-examined Levinson about her "skill level in riding and controlling horses." We conclude that they had no duty to do so.

Only after Levinson assured defendants she had experience riding horses did they allow her to ride Pistol. Bert and Anne accepted Levinson's word on the subject because she was "confident" in her claim of horse riding experience and "competent" in all her dealings with them. They knew that Pistol, a "gentle" horse, had never harmed anyone; and, as the trial court noted, Levinson was able to mount Pistol by herself and control the horse in the corral.

Under the circumstances, Levinson made a representation that defendants were entitled to accept at face value. Indeed, imagine how awkward it would have been for Bert and Anne to question the attorney's confident expression of competence as a horseback rider.

Of no assistance to plaintiffs are the holdings in *Galardi, supra,* 16 Cal.App.4th 817, and *Tan, supra,* 13 Cal.App.4th 1528, which addressed an instructor's duty to a student. The existence and scope of a defendant's duty depends on the role that the defendant played in the activity. (*Kahn, supra,* 31 Cal.4th at p. 1004.) Defendants were merely the hosts of a social gathering at

their cattle ranch, where Levinson asked to ride one of their horses; they were not instructors and did not assume any of the responsibilities of an instructor.

■ When the person who provides the horse is a social host, not a commercial operator, has not organized a horseback riding event and simply consents to a guest's request to ride the host's horse while the guest is at a gathering for another purpose, and the guest has professed to have horseback riding experience, it would be contrary to existing policy to impose the duty of additional cross-examination urged by plaintiffs. If such an awkward inquiry were necessary to avoid potential liability, few, if any, social hosts would consent to a guest's request to ride one of the host's horses. Such a result would alter and chill the sport of horseback riding in the ultimate way—by preventing the guest from engaging in the sport.

## C

In passing, plaintiffs suggest there is a triable issue of material fact as to whether defendants recklessly increased the risks inherent in horseback riding by failing to warn Levinson "of the known risks" of "Pistol's trained behaviors of starting, stopping and turning abruptly." We disagree.

As we have explained, there is no evidence that Pistol's training presented a risk of harm, beyond that inherent in horseback riding, to a pleasure rider who was not involved in cattle herding or competition riding. It is undisputed that Pistol had always been gentle when used as a pleasure horse and that, during pleasure rides by others, Pistol had never before run off or hurt anyone. Thus, defendants did not have a duty to warn Levinson about Pistol's "trained behaviors." In any event, because Levinson confidently told them she had ridden horses before, defendants had no reason to believe any warning was necessary. Besides, there is no evidence that Pistol began galloping because Levinson gave him a command to do so. Under the undisputed facts of this case, it would be sheer speculation to conclude that Pistol's training as a cattle horse had something to do with the accident, rather than it being the result of a horse unexpectedly behaving as a horse and galloping off for no apparent reason.

## D

Also without merit is plaintiffs' argument that Bert's telling Levinson not to pull back on Pistol's reins constitutes a triable issue of material fact as to whether this recklessly increased the risk of harm beyond that inherent in horseback riding.[2]

Bert's admonition was a response to Levinson's pulling on Pistol's reins, causing the horse to rear back and move around while Bert was in the process of adjusting the stirrups. And it was made to a person who professed to have experience riding horses. We are satisfied that, as a matter of law, the statement not to pull back on the reins while Pistol was standing still—because his mouth is sensitive—is not susceptible to an interpretation by any person who has ridden a horse, including those with minimal experience, as a direction to never pull on the reins to control Pistol, even if he began to run away with her. Thus, as a matter of law, the statement made to a person whom Bert believed to be an experienced rider is not the type of conduct that recklessly increases the risk of harm beyond that inherent in the sport of horseback riding.

## E

Lastly, we reject plaintiffs' claim that a triable issue of material fact exists based on defendants' "giving Levinson no instruction on how to control Pistol."

As we have explained, defendants were entitled to accept, at face value, Levinson's claim that she had experience riding horses, thus indicating she knew how to control horses. And undisputed facts established that, although Pistol was trained to react quickly while working as a cattle horse, he had a gentle disposition while ridden as a pleasure horse, and had never before run off or hurt anyone. Therefore, defendants had no reason to believe that Levinson needed instruction on how to control Pistol, and, as a matter of law, they had no duty to so instruct her.

## F

For the reasons stated above, the trial court correctly entered summary judgment for defendants on the ground that plaintiffs' action is barred

---

[2] As we noted in an earlier footnote, Levinson's description of this exchange differs from Bert's version. Bert testified at a deposition that Levinson suddenly pulled back on the reins, and he simply told her, "Ellyn, don't jerk the horse." However, in assessing a motion for summary judgment, we must view the evidence in the light most favorable to Levinson. (*Giardino, supra,* 98 Cal.App.4th at pp. 829–830.)

by the doctrine of primary assumption of the risk. Contrary to plaintiffs' claim, we are not required to credit the opinion of their expert as creating a triable issue of material fact as to whether defendants recklessly increased the risk of harm inherent in horseback riding. In plaintiffs' words, their expert "opined that when [defendants] put an inexperienced rider . . . on Pistol they recklessly increased riding's inherent risks." However, their expert's opinion is based on the false premise that defendants had a duty to inquire about Levinson's horseback riding experience and to warn and instruct her accordingly. As we have explained, defendants had no such duty. That plaintiffs' expert feels otherwise does not create a triable issue of material fact (See *Knight, supra*, 3 Cal.4th at p. 313 ["the question of the existence and scope of a defendant's duty of care is a *legal* question . . . and is an issue to be decided by the court, rather than the jury"]; *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 884 [254 Cal.Rptr. 336, 765 P.2d 498] [" 'experts may not give opinions on matters which are essentially within the province of the court to decide' "].)

## DISPOSITION

The judgment is affirmed. Plaintiffs shall reimburse defendants for their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

Nicholson, J., and Cantil-Sakauye, J., concurred.

A petition for a rehearing was denied September 25, 2009, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied November 10, 2009, S176938.